PEOPLE v HYDE

Docket No. 282782. Submitted May 14, 2009, at Petoskey. Decided
September 1, 2009, at 9:00 a.m.

George W. Hyde was charged in the Cheboygan Circuit Court with
operating a motor vehicle while intoxicated (OWI), third offense,
operating a motor vehicle with a suspended license, and possessing
an open alcohol container in a motor vehicle. The defendant moved
to suppress all evidence that resulted from his traffic stop, arguing
that the police officers had violated his Fourth Amendment right
to be free from unreasonable searches and seizures. He also moved
to suppress the evidence obtained from a blood sample drawn after
his arrest. The defendant argued that his consent to drawing the
sample was obtained through coercion because the officer incor-
rectly told him that his license would be suspended under the
implied consent statute, MCL 257.625c, if he refused the test even
though he had diabetes. The court, Scott L. Pavlich, J., denied the
motions. After a jury convicted the defendant, he appealed.

The Court of Appeals *held*:

1. The trial court did not err by denying the defendant's
motion to suppress evidence obtained after the traffic stop. For a
traffic stop to be valid, the police officer must have an articulable
and reasonable suspicion that a vehicle or one of its occupants is
subject to seizure for a violation of the law. The reasonableness of
a search or seizure depends on whether the officer's action was
justified at its inception and whether it was reasonably related in
scope to the circumstances that justified the interference in the
first place. The evidence of erratic driving, which included tire
tracks showing that the defendant's vehicle had swerved across
the road several times, gave rise to a reasonable suspicion of the
defendant's intoxication.

2. Under MCL 257.625c(2), a diabetic is not considered to have
given implied consent to having a blood sample drawn. Thus, the
officer, who knew that the defendant was a diabetic, improperly
informed the defendant of his rights under the implied consent
statute.

3. The trial court erred by reasoning that despite the officer's
incorrect advice to the defendant concerning his rights, the blood

alcohol evidence was admissible because the police had probable cause and could have obtained a warrant to draw the defendant's blood and thus the evidence would inevitably have been discovered. The inevitable discovery doctrine does not apply when no warrant was obtained and no other warrant exception could have applied but there was probable cause for a warrant. Allowing a warrantless search merely because probable cause exists would allow the inevitable discovery doctrine to act as a warrant exception that engulfs the warrant requirement. This approach would diminish the protections of the Fourth Amendment and be an incentive for improper or careless police procedure.

4. The trial court also erred by concluding that had the police officers properly understood the implied consent statute, they would inevitably have discovered evidence of the defendant's blood alcohol level through a breath or urine test. The inevitable discovery doctrine, however, did not apply because there was insufficient evidence showing whether the defendant would have consented or refused to submit to one of those tests. The defendant's consent to drawing a blood sample in the face of a threatened suspension of his license cannot be extrapolated as consent to the other tests and is not enough to demonstrate inevitability by a preponderance of the evidence.

5. The error was not harmless. The jury verdict form indicated that the jury convicted the defendant of OWI under the theory that he had operated the motor vehicle "with a bodily alcohol content of 0.08% or more." The blood alcohol evidence clearly contributed to the defendant's conviction, and it is not clear beyond a reasonable doubt that a rational jury would have found the defendant guilty of OWI absent the error in admitting that evidence. It would be inconsistent with substantial justice and result in a miscarriage of justice to allow the defendant's conviction of OWI to stand under a theory different than the one that the jury specifically determined.

Reversed and remanded for entry of an order vacating the OWI conviction.

SEARCHES AND SEIZURES — CONSTITUTIONAL LAW — INEVITABLE DISCOVERY DOCTRINE — PROBABLE CAUSE TO OBTAIN A WARRANT.

The inevitable discovery doctrine does not apply when the police obtained no search warrant and no other warrant exception could have applied but probable cause existed for a warrant.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Joel McGormley*, Assistant Attorney General, for the people.

*Gauthier & Goodrich, PC* (by *Aaron J. Gauthier*), for the defendant.

Before: WHITBECK, P.J., and DAVIS and GLEICHER, JJ.

PER CURIAM. Defendant, George Hyde, appeals as of right his jury trial convictions of operating a motor vehicle while intoxicated, third offense,[1] operating a motor vehicle while his license was suspended,[2] and possession of an open alcohol container in a motor vehicle.[3] The trial court sentenced Hyde to six months in jail for the conviction of operating a motor vehicle while intoxicated, three months in jail for the conviction of operating a motor vehicle while his license was suspended, three months in jail for the conviction of possessing an open alcohol container in a motor vehicle, and 18 months' probation. We reverse in part and remand.

### I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from a police stop of Hyde while he was driving his motor home on January 15, 2007, in Tuscarora Township, Michigan. Officer Dale Williams of the Tuscarora Township Police Department testified that he was on patrol with his partner, Officer Walter Chamberlain, on January 15, 2007, in a marked police car. While traveling south along I-75, Officer Chamberlain noticed tire tracks that went from the extreme right to the extreme left side of the road, covering both lanes of travel. Officer Williams followed the tracks off I-75 at the Indian River exit and then continued to follow the tracks in order to catch up with the vehicle

---

[1] MCL 257.625(1) and (9)(c).

[2] MCL 257.904(1).

[3] MCL 257.624a.

that was leaving them to determine why that vehicle was weaving in the roadway. The tracks, which came from a vehicle with dual rear wheels on each side, continued west along M-68 before making a turn to head south and then turning again to continue traveling on westbound M-68. The vehicle's tracks appeared to make a U-turn at a parking lot and then continued west on M-68. Officer Williams did not stop at the parking lot to determine if the vehicle had stopped there.

Officer Williams caught up with Hyde's vehicle, a motor home, on M-68 when he observed it halfway across the center of the roadway. Officer Williams testified that the roadway was snow-covered, so the centerline was not clearly visible, but the vehicle was in the middle of the roadway. Officer Williams testified that he was positive that Hyde's vehicle was the same vehicle that left the weaving tracks because of the dual-rear-wheel configuration, because of the ease of following the tracks in the light snowfall, and because no other tracks had crossed the ones they were following. Officer Williams testified that he observed that the tire tracks weaved across the roadway six or more times. He also testified that he did not include the weaving tire tracks in his police report because he stopped Hyde's vehicle on the basis of his observation that the vehicle was in the center of the roadway. On cross-examination, Officer Williams testified that he did not put any information about the tracks or I-75 in his first report, but filed a supplemental report just before the proceeding at which Hyde challenged the reason for the traffic stop. Officer Williams also acknowledged that it was not an unusual practice for a person to drive straddling the centerline in inclement weather when there is no oncoming traffic.

Using his emergency overhead lights, Officer Williams stopped Hyde's vehicle at 1:55 a.m. and then approached the vehicle. A video recording of the stop began when the camera for the police car was automatically activated at the same time Officer Williams activated his emergency overhead lights. Officer Williams asked the driver, who was later identified as Hyde, to get out of the vehicle because a dog was inside it. At his first contact with Hyde, Officer Williams smelled intoxicants. Hyde appeared to have slow motor skills and poor balance when he got out of the vehicle. Hyde also demonstrated slurred speech and was unable to say the alphabet or count from 17 to 25 and then back down to 23. Hyde told Officer Williams that he probably could not do the counting exercise sober. When Officer Williams asked him if he was not sober, Hyde responded that he was not going to lie to Officer Williams and then attempted and failed to complete the counting exercise. Officer Williams testified that he was aware that a diabetic may sometimes appear intoxicated because of blood sugar problems and that he was aware Hyde was diabetic because Hyde had told him so. However, Officer Chamberlain testified that, in his experience, someone who was suffering from diabetic problems would still be able to say the alphabet and count.

Hyde said that he did not have a driver's license because it was suspended and provided Officer Williams with a tribal card for identification. Hyde also told Officer Williams that he was coming from Marquette, Michigan, and had consumed five or six beers. According to Officer Williams, Hyde first stated that he had been drinking since Marquette, but there was no audio of this on the video recording of the stop. Later during the stop, Hyde said that he had been drinking since he passed through Newberry, Michigan, at 11:00 p.m.; this statement was recorded on the video. Officer Williams

testified that Newberry is 106 miles from Cheboygan and that Marquette is 103 miles from Newberry. Officer Williams did not have Hyde do any field tests involving balance because Hyde indicated that he had a medical condition other than his diabetes that Officer Williams had never heard of and also because Officer Williams did not want Hyde to slip and fall in the snow.

Later during the stop, Officers Williams and Chamberlain entered Hyde's motor home after Hyde said he was cold, and Hyde then produced his registration and proof of insurance. While inside the motor home, Officer Williams observed a brown paper bag directly to the right of the driver's seat with a six-pack of Coors beer inside it. There were four empty bottles, while the fifth bottle was three-quarters empty and the sixth was unopened. There were also beer cans in the sink that Hyde claimed were his daughter's from a previous night. Officers Williams and Chamberlain, who had both made more than 100 drunk-driving arrests in their careers, believed that Hyde was under the influence of alcohol.

The police arrested Hyde, and before leaving the scene, Officer Williams asked Hyde if he needed his insulin, but Hyde stated that he had already taken some. Hyde was advised of his rights and asked to complete a sobriety test at the Cheboygan County Jail, which was videotaped. A sample of Hyde's blood was taken at 3:30 a.m. The parties stipulated that the proper procedures were used in withdrawing Hyde's blood. There were no fingerprints taken from the beer bottles, and Hyde's blood sugar levels were not checked. The blood test revealed that Hyde's blood alcohol content was 0.13 grams per 100 milliliters of blood.

The video recording of the stop and the video recording of what happened at the jail were both admitted into evidence, and both tapes were played for the jury.

Officer Williams also testified that he had received certification from the state of Michigan indicating that Hyde's driving privileges had already been revoked when the stop took place. The parties also stipulated that Hyde's license was revoked and that he was aware of this revocation.

Hyde moved to suppress all evidence that resulted from his stop because it violated his constitutional right to be free from unreasonable searches and seizures. During the hearing, the prosecution argued that because the police officers had observed the swerving tracks and saw Hyde driving over the centerline, the stop was reasonable and that the motion should be denied. Hyde argued that the videotape of the stop showed that no lines were visible on the road because of the snow, and the officer agreed that no lines were visible. On the basis of this, Hyde contended that there were no grounds for the stop and any evidence seized as a result of the stop should be suppressed.

The trial court denied Hyde's motion, finding that Officer Williams was able to observe the tracks because of the freshly fallen snow and the absence of other tire tracks. The trial court reasoned that although the centerline was not visible because of the steady snowfall, with reasonable observation one could estimate the vehicle's position on the roadway. The trial court also reasoned that since they had followed Hyde's vehicle's tracks, it was reasonable for these officers to conclude that Hyde was driving with impaired abilities because the tracks went back and forth across the roadway and because Officer Williams observed Hyde's vehicle cross the center of the road. The trial court concluded that these facts were enough for a reasonable person to believe that Hyde was operating a vehicle while he was under the influence of alcohol.

Hyde also moved to suppress his blood sample and the blood test results, arguing that his Fourth Amendment rights were violated because his consent to the blood drawing was the product of coercion when the police incorrectly told him that the implied consent statute still applied to him even though he had diabetes. The trial court denied Hyde's motion to suppress, concluding that although Hyde had been improperly informed about the consequences of his refusal to take a blood test because he was a diabetic, his bodily alcohol content would have been inevitably discovered had the officer followed the correct procedure. The trial court reasoned that the officer had the option to request that Hyde take either a breath or urine test. The trial court stated that it was unaware of any advantage a blood test gave over these other tests. The trial court also concluded that it was not apparent from the record that Hyde would have refused a breath test or a urine test because he consented to the blood test and that if he had refused, the officer could have obtained a warrant for a blood test because the officer had sufficient probable cause. The trial court relied on *People v Brzezinski*[4] for the proposition that suppression would not be appropriate when there was probable cause to secure a warrant because the evidence would have been obtained regardless.

## II. SUPPRESSION OF THE TRAFFIC STOP EVIDENCE

### A. STANDARD OF REVIEW

Hyde argues that his convictions should be vacated on the ground that the trial court erred by denying his motion to suppress evidence seized after his vehicle was stopped because the police did not have reasonable

---

[4] *People v Brzezinski*, 243 Mich App 431; 622 NW2d 528 (2000).

suspicion to justify the stop. Hyde contends that Officer Williams's testimony established that Hyde's crossing of the centerline was not an unusual driving tactic in inclement weather and that simply crossing the centerline one time in snowy conditions does not constitute reasonable suspicion. Moreover, Hyde argues that although there was testimony about tracks on I-75 crossing from one lane to the other, Officer Williams testified that these tracks did not form the basis of his stop, and he admitted that there were other tracks on I-75 at the time. We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress.[5] We review de novo whether the Fourth Amendment was violated and whether an exclusionary rule applies.[6]

### B. LEGAL STANDARDS

The benchmark for satisfaction of Fourth Amendment rights is reasonableness, and reasonableness requires a fact-specific inquiry that is measured by examining the totality of the circumstances.[7] "In order to effectuate a valid traffic stop, a police officer must have an articulable and reasonable suspicion that a vehicle or one of its occupants is subject to seizure for a violation of law."[8]

### C. APPLYING THE STANDARDS

Given Officer Williams's testimony, he and his partner had a reasonable suspicion that criminal activity

---

[5] *People v Dunbar*, 264 Mich App 240, 243; 690 NW2d 476 (2004).

[6] *People v Fletcher*, 260 Mich App 531, 546; 679 NW2d 127 (2004).

[7] *People v John Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005).

[8] See *People v Matthew Williams*, 236 Mich App 610, 612; 601 NW2d 138 (1999).

was taking place when they decided to stop Hyde to investigate whether he was intoxicated while driving his motor home. The police observed a set of dual-wheeled tracks in the freshly fallen snow that swerved across two lanes of the road. Following these tracks, which were not obscured by other tracks on the road, they observed at least six instances where the tracks swerved across the road. When Officers Williams and Chamberlain caught up with Hyde's vehicle, which was a dual-wheeled motor home, they observed it traveling in the middle of the road. According to Officer Williams, they had followed the same set of tracks the entire time.

"[T]he reasonableness of a search or seizure depends on 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' "[9] Moreover, erratic driving, such as swerving within a lane and driving on the lane markers, can give rise to a reasonable suspicion of intoxication justifying an investigatory stop.[10]

The police officers observed swerving tracks of a dual-wheeled vehicle and followed those tracks until catching up with Hyde's dual-wheeled vehicle. The numerous swerves from one side of the roadway, the clear tracks left by the same vehicle, and Hyde's driving in the center of the road when the officers caught up to him together suggest that he was driving erratically, which justified the officers' stopping him to investigate whether he was intoxicated. Therefore, we conclude that the trial court did not err by denying Hyde's motion to suppress evidence obtained after the traffic stop.

---

[9] *John Williams, supra* at 314, quoting *Terry v Ohio,* 392 US 1, 20; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

[10] *People v Christie (On Remand),* 206 Mich App 304, 309; 520 NW2d 647 (1994).

### III. SUPPRESSION OF THE BLOOD SAMPLE

#### A. STANDARD OF REVIEW

Hyde argues that the trial court erred by failing to suppress his blood sample. He contends that the trial court erred by concluding that the evidence could be admitted under the inevitable discovery doctrine because the police could have obtained a warrant if not for their mistake in advising him of his rights under the informed consent statute. Hyde argues that this doctrine should not apply because it would create an exception that would obviate the need to obtain a warrant in any situation in which there is probable cause. Moreover, Hyde contends that the rationale—that the police would have done a urine or a breath test had they properly understood the informed consent statute—is too speculative for the doctrine to apply and would have produced different pieces of evidence than a blood sample. As stated earlier, we review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress.[11] And we review de novo whether the Fourth Amendment was violated and whether an exclusionary rule applies.[12]

#### B. LEGAL STANDARDS

"It is well settled that both the United States Constitution[13] and the Michigan Constitution[14] 'guarantee the right of persons to be secure against unreasonable searches and seizures.' "[15] The Michigan Constitution in

---

[11] *Dunbar, supra* at 243.

[12] *Fletcher, supra* at 546.

[13] US Const, Am IV.

[14] Const 1963, art 1, § 11.

[15] *People v Hellstrom,* 264 Mich App 187, 192; 690 NW2d 293 (2004), quoting *People v Kazmierczak,* 461 Mich 411, 417; 605 NW2d 667 (2000).

this regard is generally construed to provide the same protection as the Fourth Amendment of the United States Constitution.[16] "Generally, if evidence is unconstitutionally seized, it must be excluded from trial."[17] "Exclusion of improperly obtained evidence serves as a deterrent to police misconduct, protects the right to privacy, and preserves judicial integrity."[18]

### C. THE INEVITABLE DISCOVERY EXCEPTION

In *Nix v Williams*,[19] the United States Supreme Court adopted the ultimate or inevitable discovery exception to the exclusionary rule. The Court held that when information is discovered after the police violate the Fourth Amendment, the evidence should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . ."[20] The rationale for this inevitable discovery exception is that

> the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.[21]

The inevitable discovery doctrine, as applied by Michigan caselaw, permits the admission of evidence obtained in violation of the Fourth Amendment if it can

---

[16] *People v Levine*, 461 Mich 172, 178; 600 NW2d 622 (1999).

[17] *People v Brown*, 279 Mich App 116, 127; 755 NW2d 664 (2008).

[18] *Id.*

[19] *Nix v Williams*, 467 US 431; 104 S Ct 2501; 81 L Ed 2d 377 (1984).

[20] *Id.* at 444.

[21] *Id.* at 443.

be shown by a preponderance of the evidence that the items found would have ultimately been obtained in a constitutionally accepted manner.[22] Three concerns arise in the inevitable discovery analysis: (1) whether the legal means are truly independent, (2) whether both the use of the legal means and the discovery by that means are truly inevitable, (3) and whether the application of the inevitable discovery doctrine provides an incentive for police misconduct or significantly weakens Fourth Amendment protections.[23]

### D. THE IMPLIED CONSENT STATUTE

In this case, it is undisputed that Officer Williams improperly informed Hyde of his rights under Michigan's implied consent statute. The statute provides:

> (1) A person who operates a vehicle upon a public highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state is considered to have given consent to chemical tests of his or her blood, breath, or urine for the purpose of determining the amount of alcohol or presence of a controlled substance or both in his or her blood or urine or the amount of alcohol in his or her breath in all of the following circumstances:
>
> (a) If the person is arrested for a violation of [MCL 257.625(1)], (3), (4), (5), (6), (7), or (8), [MCL 257.625a(5)], or [MCL 257.625m] or a local ordinance substantially corresponding to [MCL 257.625(1)], (3), (6), or (8), [MCL 257.625a(5)], or [MCL 257.625m].

\* \* \*

---

[22] *People v Stevens* (*After Remand*), 460 Mich 626, 637; 597 NW2d 53 (1999); *People v Kroll*, 179 Mich App 423, 429; 446 NW2d 317 (1989).

[23] *Stevens, supra* at 638.

(2) A person who is afflicted with hemophilia, diabetes, or a condition requiring the use of an anticoagulant under the direction of a physician is not considered to have given consent to the withdrawal of blood.[24]

The consequences for refusing to submit to the requested test are described in MCL 257.625a(6)(b)(v), which states: "Refusing a peace officer's request to take a test described in [MCL 257.625a(6)(b)(i)] will result in the suspension of his or her operator's or chauffeur's license and vehicle group designation or operating privilege and in the addition of 6 points to his or her driver record."

### E. APPLYING THE STANDARDS AND THE STATUTE

Hyde is a diabetic, and it is undisputed that Officer Williams was aware of this fact. However, according to the prosecution's offer of proof at the suppression hearing, to which Hyde had no objections, Officer Williams was unaware of the diabetes exception for a blood withdrawal under the implied consent statute. Therefore, Officer Williams erroneously instructed Hyde that if he refused to provide a blood sample, the consequences described in MCL 257.625a(6)(b)(v) would apply. On the basis of this incorrect information, Hyde consented to providing a blood sample. The police did not obtain a search warrant or take any steps to do so.

According to the prosecution, however, Officer Williams would have secured a search warrant for Hyde's blood had he known of the exception for diabetics in the implied consent statute because there was sufficient evidence to establish probable cause for a warrant. The prosecution also stated that had Officer

---

[24] MCL 257.625c.

Williams been aware of the diabetes exception, he could have demanded that Hyde submit to a breath or urine test under the implied consent statute because the diabetes exception does not apply to those tests. The trial court adopted these rationales by concluding that although Hyde's rights were violated, the evidence would inevitably have been discovered by a breath or urine test without a warrant under the implied consent statute or the police could have obtained a warrant. We will separately analyze these two prongs of the trial court's rationale for admitting the evidence resulting from Hyde's blood test.

### 1. SUFFICIENT PROBABLE CAUSE TO OBTAIN A WARRANT

With regard to its conclusion that the police could have obtained a warrant, the trial court relied on *People v Brzezinski*,[25] observing that the *Brzezinski* Court "in its analysis in that situation found that the police may very well have had information necessary to secure a warrant and if so, the evidence would have been obtained had the law been complied with and therefore suppression would not be appropriate."

This Court has never held in a binding decision that the inevitable discovery doctrine may apply when no warrant was obtained and no other warrant exception could have applied but there was probable cause for a warrant. *Brzezinski*, while suggesting this may be allowable, did not definitively answer the question. In *Brzezinski*,

> Defendant moved to suppress evidence found by state troopers when they searched him after they found him unconscious in the back seat of a vehicle near the scene of a suspicious fire. Defendant matched the description of a

---

[25] *Brzezinski, supra.*

man seen leaving the scene of the fire who seemed to be disoriented and injured.[26]

This Court remanded the case for a determination whether the inevitable discovery doctrine should apply.[27] This Court reasoned that if there was probable cause for the issuance of a warrant, the incriminating evidence found in the defendant's pockets would have been discovered anyway, despite the police misconduct.[28] Both parties here agree that this Court was not making a definitive statement of law in *Brzezinski*, but the prosecution argues that the case strongly suggests that the inevitable discovery doctrine should be applied in this context, in which the police had probable cause but did not obtain a warrant. We agree that, as Hyde argues, the dicta from *Brzezinski* should not be construed as an authoritative rule of law. Moreover, there are no decisions relying on *Brzezinski* for this holding. *Brzezinski* only commented that the doctrine might apply in this context, so a more thorough analysis is necessary and federal decisions, although not binding, are helpful in this regard.

The federal circuits have adopted differing views on the application of the inevitable discovery doctrine. Several circuits completely reject applying the inevitable discovery doctrine in a situation in which there was probable cause but a warrant was not obtained before the illegal search. The United States Court of Appeals for the Sixth Circuit stated in *United States v Johnson*[29] that "to hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that

---

[26] *Id.* at 432.

[27] *Id.* at 437.

[28] *Id.* at 436-437.

[29] *United States v Johnson*, 22 F3d 674, 683 (CA 6, 1994).

there is inevitable discovery and no warrant requirement whenever there is probable cause." Additionally, the United States Court of Appeals for the Ninth Circuit stated in *United States v Mejia*:[30]

> If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant. To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.

The United States Court of Appeals for the Fourth Circuit also agreed with this position in *United States v Allen*.[31]

However, other circuits have permitted evidence under the inevitable discovery doctrine when, even though the evidence was obtained illegally, a warrant would have been obtained had the police sought one.[32] The courts that allow this application of the doctrine in the warrantless context when no other warrant exceptions could have applied generally require the prosecution to show that (1) the police had a high level of probable cause to obtain a warrant, (2) the police were in the process of obtaining a warrant, and (3) the same evidence would have been obtained pursuant to the eventual warrant.[33]

But even under this more expansive application of the inevitable discovery doctrine, we conclude that the

---

[30] *United States v Mejia*, 69 F3d 309, 320 (CA 9, 1995) (emphasis in original).

[31] *United States v Allen*, 159 F3d 832, 842 (CA 4, 1998).

[32] See *United States v Brown*, 328 F3d 352, 357 (CA 7, 2003); *Unites States v Souza*, 223 F3d 1197, 1203-1205 (CA 10, 2000); *United States v Ford*, 22 F3d 374, 377-381 (CA 1, 1994).

[33] *Souza, supra* at 1203-1205.

evidence here should have been excluded. Although there was a high level of probable cause to obtain a warrant and the same evidence—Hyde's blood—would have been obtained pursuant to the eventual warrant, it is obvious that the police were not in the process of obtaining a warrant when they secured Hyde's invalid consent. Officer Williams did not understand the implied consent statute exception for diabetics and did not attempt to correct his mistake once Hyde's blood sample was obtained.

Moreover, the line of reasoning that does not permit the doctrine to apply is particularly persuasive when placed in the context of Michigan's three concerns with applying the inevitable discovery doctrine—independent legal means, inevitability of use of the legal means and discovery of the evidence, and incentive for police misconduct or significant weakening of Fourth Amendment protections.[34] Under the facts here, there was an independent legal means to obtain the evidence by securing a search warrant. The discovery of the evidence was also inevitable because it is undisputed that Officer Williams would have secured a warrant had he realized his error. Also, there was easily enough evidence to establish probable cause based on Hyde's erratic driving, admission that he had been drinking, and his failure of two sobriety tests. *However*, the damage that would be done to the Fourth Amendment and the incentive for police misconduct by adopting the inevitable discovery doctrine under these circumstances outweigh these considerations. To allow a warrantless search merely because probable cause exists would allow the inevitable discovery doctrine to act as a warrant exception that engulfs the warrant requirement. Even in the context of a good-faith error, we reject the notion that a post hoc

---

[34] *Stevens, supra* at 638.

probable cause analysis can preclude the constitutional requirement that a neutral and detached magistrate issue the warrant. Such an approach diminishes the Fourth Amendment and is an incentive for improper or careless police practices.

## 2. ALTERNATIVE BREATH OR URINE TESTS

The trial court's second rationale for allowing the evidence to be admitted was that it would have been obtained through a urine test or a breath test if the police had properly understood the implied consent statute. The trial court found that there was no evidence of whether these tests would yield different results. And the trial court concluded that the statute provided each test as an alternative for obtaining a person's blood alcohol content. However, the inevitable discovery doctrine is inapplicable because there is insufficient evidence to show whether Hyde would have consented or refused to submit to those tests. Although Hyde consented to the blood test because he was told that his refusal would result in suspension of his driving privileges, this consent cannot be extrapolated as consent to the other tests. In other words, the trial court's analysis requires the assumption that because Hyde consented to the blood drawing, when given the same information about the consequences of refusing a breath or urine test, he would still have consented. While the circumstances suggest that this is a possibility because of Hyde's consent to the blood drawing, the logical leap of inferring Hyde's consent to a breath or a urine test is not enough to demonstrate inevitability by a preponderance of the evidence.[35]

---

[35] See *Nix, supra* at 445 n 5 (holding that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment").

In sum, we conclude that because no application of the inevitable discovery doctrine saves the warrantless search, the trial court should have suppressed the evidence of Hyde's blood sample and test results.

### F. HARMLESS ERROR

When a defendant shows preserved, constitutional error, "[i]f the error is not a structural defect that defies harmless error analysis, the reviewing court must determine whether the beneficiary of the error has established that it is harmless beyond a reasonable doubt."[36] "A constitutional error is harmless if '[it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' "[37] There must be no "reasonable possibility that the evidence complained of might have contributed to the conviction."[38] Under the circumstances presented here, we conclude that the trial court's failure to suppress the blood sample evidence was not harmless beyond a reasonable doubt.

The amended felony information charged Hyde generally under MCL 257.625(1), operating a motor vehicle while intoxicated (OWI), stating that Hyde "did, operate a vehicle upon a highway, M-68, while under the influence of a controlled substance and/or alcoholic liquor, *or* having an alcohol content of 0.08 grams or more per 100 milliliters of blood[.]"[39] OWI is a hybrid version of two offenses: MCL 257.625(1)(a) prohibits

---

[36] *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

[37] *People v Mass*, 464 Mich 615, 640 n 29; 628 NW2d 540 (2001), quoting *Neder v United States*, 527 US 1, 18; 119 S Ct 1827; 144 L Ed 2d 35 (1999).

[38] *People v Anderson (After Remand)*, 446 Mich 392, 406; 521 NW2d 538 (1994) (quotation marks and citations omitted).

[39] Emphasis added.

operating a motor vehicle under the influence of intoxi-
cating liquor (OUIL) and MCL 257.625(1)(b) prohibits
operating with an unlawful bodily alcohol content
(UBAL). Therefore, under MCL 257.625(1), OWI re-
quires proof of three elements: (1) the defendant oper-
ated a motor vehicle (2) on a highway or other place
open to the general public or generally accessible to
motor vehicles (3) while under the influence of liquor or
a controlled substance, or a combination of the two, *or*
with a blood alcohol content of 0.08 grams or more per
100 milliliters of blood. Notably, the third element is
disjunctive; that is, it can be satisfied in *either* of the
two ways.

In keeping with the alternative theories of guilt
presented to the jury, the jury verdict form provided in
pertinent part as follows:

### *Count I*
Operating While Intoxicated

(1) / / Not Guilty

(2) / / Guilty of Operating While Intoxicated (OWI) because
of:

   (A) / / operating under the influence of:

      (i) / / alcohol

      (ii) / / a controlled substance

      (iii) / / a combination of alcohol and a controlled
      substance

   (B) / / operating with a bodily alcohol content of 0.08% or
more

The jury chose option (2)(B), "operating with a bodily
alcohol content of 0.08% or more[.]"

It is clear from the jury verdict form that the jury
specifically determined that Hyde was guilty of operat-
ing a motor vehicle while intoxicated under the theory

that he was operating a vehicle "with a bodily alcohol content of 0.08% or more." Despite the evidence presented in the record that could reasonably support a conviction under the first theory of OWI (the officers' observations, Hyde's own admissions, Hyde's slurred speech and failure of two sobriety tests, and the physical beer bottle evidence), we conclude that it would be inconsistent with substantial justice[40] and result in a miscarriage of justice[41] to allow Hyde's conviction under MCL 257.625(1) to stand under a different theory than the one specifically determined by the jury. The blood alcohol evidence clearly contributed to Hyde's conviction,[42] and it is not clear beyond a reasonable doubt that a rational jury would have found Hyde guilty of OWI absent the error in admission of the blood alcohol evidence.[43]

We reverse in part and remand for entry of an order vacating Hyde's OWI conviction under the theory that he operated a vehicle "with a bodily alcohol content of 0.08% or more[.]" We do not retain jurisdiction.

---

[40] MCR 2.613(A).

[41] MCL 769.26.

[42] See *Anderson, supra* at 406.

[43] See *Mass, supra* at 640 n 29.