# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CARL RENE BRUNER II,

Defendant-Appellant.

UNPUBLISHED
August 21, 2018

No. 325730
Wayne Circuit Court
LC No. 14-008324-FC

ON REMAND

Before: METER, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a); assault with intent to murder, MCL 750.83; being a felon in possession of a firearm, MCL 750.224f; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to life in prison for the murder conviction, 37 ½ to 75 years for the assault conviction, and 40 months to 5 years for the felon-in-possession conviction, to be served concurrently, but consecutively to a two-year term of imprisonment for the felony-firearm conviction. Defendant was tried jointly, before a single jury, with codefendant Michael Lawson. This Court affirmed defendant's convictions and sentences. *People v Bruner*, unpublished per curiam opinion of the Court of Appeals, issued October 11, 2016 (Docket No. 325730), rev'd ___ Mich ___ (2018). After defendant appealed to the Michigan Supreme Court, that Court concluded that the admission at trial of the testimony of Westley Webb from Lawson's preliminary examination violated defendant's constitutional right to confront Webb.[1] *People v Bruner*, ___ Mich ___, ___; ___ NW2d ___ (Docket No. 154779); slip op at 1. Webb testified at the preliminary

---

[1] We note that defendant's entire Confrontation Clause issue when he appealed to this Court was based on his inability to confront *Lawson*, the codefendant (who provided a nontestimonial statement); defendant never raised the issue that admitting Webb's testimony violated his right to confront *Webb*. The Supreme Court, at any rate, was entitled to raise this issue of its own accord.

-1-

examination about certain statements that Lawson made to him. The trial court admitted the prior testimony only against Lawson, and any reference to defendant in Webb's testimony was replaced by a reference to "Blank." The Supreme Court effectively ruled that these redactions and an instruction to the jurors to apply the testimony only to Lawson did not lessen any prejudice to defendant emanating from Webb's testimony. *Id*., slip op at 8-10. However, the Court has asked us to determine whether, despite the prejudicial testimony, "the prosecution has established [that] the preserved constitutional error was harmless beyond a reasonable doubt." *Id*., slip op at 10. We conclude that it has and thus once again affirm.[2]

We first summarize the inculpatory, untainted evidence against defendant presented by the prosecution. In June 2012, defendant was involved in a physical altercation around midnight, on the second floor of a Detroit nightclub: defendant punched a woman twice with a closed fist. When security guards restrained him, defendant was "[i]rate, agitated, [and] fighting the whole thing." He continued to fight the guards and act "[l]oud and crazy" and "aggressive" as he was removed from the club. A security guard described him as "ready to fight" and testified that defendant said, "I'll be back," in a "[r]eally aggressive" tone, as he left. A security supervisor observed defendant "pointing like I'm going to get you . . . ." The pointing was described as "[the] right hand and index finger pointed forward and moving the finger forward[.]" The security supervisor read defendant's lips and interpreted them as defendant saying to the security guards, "[Y]ou are going to get yours." A video of defendant's ejection from the club was played to the jury.

Defendant returned to the club five to seven minutes afterward to get his keys, banging on the doors. Defendant refused to allow security guards to search him for weapons. As a result, he was not allowed back inside, but a guard found his keys and brought them outside to him. Subsequently, defendant began watching the club from the sidewalk across the street. Then, at approximately 2:00 a.m., he returned to the club and demanded his telephone. He had not calmed down, he again refused to allow security guards to search him for weapons, and he departed without the telephone. A security guard described him as "real upset" and "hostile." Another guard described him as "agitated."

Defendant then returned to his post across the street, where he talked on a cellular telephone and was soon picked up by Lawson in a gray Dodge Charger. The Charger then slowly circled the blocks surrounding the club, eliciting the concern of the security guards who were outside the club. Two of the guards, both of whom were shot and one of whom died, were so concerned that they drew their weapons and held them to their sides. The surviving guard testified that, at a certain point, defendant was no longer in the car; Lawson parked it by Sweetwater Tavern, across the street from the club, drawing the guards' attention toward him.

---

[2] Defendant argues that we should not address whether the error was harmless, but this is the very issue the Supreme Court has ordered us to consider. Accordingly, we are obligated to address it. *Rodriguez v Gen Motors Corp*, 204 Mich App 509, 514; 516 NW2d 105 (1994).

The shooter then fired numerous shots toward the guards' backs. The victims were struck from behind, with one dying from the gunshot wound.[3]

A woman defendant had dated until the date of the shooting testified that defendant did not meet her as he had planned to on the night of June 19, 2012, and after this missed meeting, she did not speak with him for approximately a year. The murder victim's mother testified that she knew defendant and used to "lov[e] him like [a] son," that she and defendant spoke once or twice a week before the shooting, but that she never heard from him again after the shooting. Defendant also failed to show up to a meeting with one of her other sons after the murder victim's death was raised in a brief discussion between defendant and the son.[4]

Given the evidence demonstrating defendant's (1) motive; (2) threats; (3) aggressiveness; (4) refusal to be patted down for weapons upon returning to the club; (5) "casing" of the area on foot and later in the Charger, *to the point where the security officers drew their weapons and held them to their sides*; (6) subsequent absence from the Charger; (7) opportunity to shoot the guards in the back while they focused on Lawson and the Charger; and (8) strange and atypical behavior after the shooting, *especially* the drastic change in his relationship with the murder victim's mother, the prosecution had a very strong circumstantial case against defendant. It is crucial to view this evidence in the context of what Webb's testimony *added* in terms of defendant's culpability. Webb's testimony was almost entirely cumulative to testimony provided by other witnesses; for example, he testified that Lawson told him about "Blank" getting into an altercation in the club and about "Blank" and Lawson "r[iding] around in the car . . . ." The only matter on which Webb added to defendant's culpability involved a gun: Webb testified that Lawson told him that "they" had a gun in the Charger. Webb then stated, "he didn't say that, you know, that 'Blank' just took the gun. He didn't tell me all of that . . . ." The prosecutor then asked Webb if he remembered telling a police officer that Lawson had told him that "Blank" had a gun. Webb stated that he remembered this but that he "[didn't] think it was worded exactly that way."

---

[3] The surviving guard out of the two gunshot victims testified that he saw defendant and Lawson in the vehicle, going past the club, and then, as it approached another time, he saw that only Lawson was in the vehicle. He stated that he was worried about a "drive by" or a "fight" and was "[t]rying to protect [himself]," and that he and the other guard (the murder victim) pulled out their weapons because they "kind of know what's going on." He testified that immediately after Lawson parked the Charger, the two guards "turned a little bit facing towards [Lawson]" and "all of a sudden shots are fired from behind us . . . ." Another security guard testified that the guards "were on heighten[ed] awareness" when they observed the Charger's movements around the club and noticed that defendant was no longer in the Charger, because "[s]ituations like that near the end of the club somebody is mad you never know what they're willing to do."

[4] Evidence of a defendant's consciousness of guilt is relevant. See *People v Schaw*, 288 Mich App 231, 237-238; 791 NW2d 743 (2010).

On cross-examination by Lawson's attorney, Webb affirmed that he was testifying against Lawson as part of a "deal to avoid[] jail time . . . ."[5] The attorney asked Webb if he had any convictions "involving theft or dishonesty," and Webb responded, "Identity theft and receiving and concealing stolen goods." Webb also admitted that he did not provide a statement to the police until 2014, when it was "brought up again by somebody else . . . ." He admitted that his written police statement referred to "Blank" "le[aving] and c[oming] back with a gun," but, importantly, he specifically disavowed this wording, saying, "I didn't say he said that they left and came back with a gun. I said that they left." He explained the disavowal by saying that the written police statement was "hard for [him] to read" because of the handwriting and that "when [he] signed it [he] didn't really pay that much attention to it." In addition, he answered, "No, he did not," when asked if Lawson "said that he knew 'Blank' was going to shoot somebody . . . ."

Lawson's attorney cast some doubt on the veracity of Webb's testimony in general, and, as recited above, the testimony about the gun was somewhat convoluted. It is true that Webb's testimony was the only testimony explicitly referring to a gun in the possession of the two codefendants (i.e., in the Charger), but it is important to remember that the jury heard evidence that, upon returning to the club, defendant refused to be patted down for weapons.[6]

In light of (1) the strong and untainted circumstantial case against defendant, as outlined above; (2) the impeachment in general of Webb; (3) the lack of any affirmative "confession" in Lawson's statements to Webb, and (4) defendant's refusal to be patted down for weapons, which allowed for an inference of his being armed, we conclude that the admission of Webb's testimony was harmless beyond a reasonable doubt. Testimony from a not-particularly-strong witness that defendant and Lawson had a gun in the Charger would not reasonably have tipped the scales from an acquittal to a conviction, in light of all the other evidence. In other words, "it is clear beyond a reasonable doubt[7] that a rational jury would have found the defendant guilty absent the error"; there is "no *reasonable* possibility that the evidence complained of might have contributed to the conviction." *People v Hyde*, 285 Mich App 428, 447; 775 NW2d 833 (2009) (quotation marks, citations, and alterations omitted; emphasis added). Accordingly, we once again affirm.

---

[5] At the conclusion of Webb's testimony, the parties stipulated that Webb pleaded guilty in February 2014 to identity theft and receiving and concealing stolen property and that he received a sentence of probation.

[6] A club manager specifically testified that security pat-downs were for weapons. He replied, "For security reasons [one] can't bring a weapon in the building," when asked why security officers were attempting to pat down defendant. Obviously, defendant's refusal to be patted down does not automatically mean that defendant was armed, but his being armed is an inference that *could* be made in light of all the other untainted evidence.

[7] This Court has defined "reasonable doubt" as "an honest doubt based upon reason." *People v Jackson*, 167 Mich App 388, 391; 421 NW2d 697 (1988).

Affirmed.

/s/ Patrick M. Meter
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien