*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

JEFFERY SCOTT ARMSTRONG,

        Defendant-Appellee.

FOR PUBLICATION
November 22, 2022
9:05 a.m.

No. 360693
Wayne Circuit Court
LC No. 21-003294-01-FH

Before: GLEICHER, C.J., and SERVITTO and YATES, JJ.

YATES, J.

Body camera footage is an invaluable resource for courts facing suppression motions, but it rarely serves as a stand-alone source of information about a warrantless search or seizure. Here, the trial court was hamstrung in analyzing the validity of a warrantless search of defendant, Jeffery Scott Armstrong, and the subsequent seizure of a gun because the trial court was given no evidence other than body camera footage. Despite that disadvantage, the trial court dutifully made findings of fact and ordered the suppression of the gun. Because we conclude that the trial court's findings of fact were not clearly erroneous and its conclusions of law were sound, we shall affirm the trial court's suppression order.

## I. FACTUAL BACKGROUND

On October 8, 2020, law-enforcement officers conducting a home-compliance check in the city of Detroit came upon a Jeep Cherokee parked on the street. They spoke to a woman who was in the driver's seat and to Armstrong, who was sitting in the front passenger's seat. What piqued the interest of the law-enforcement officers at first was the scent of marijuana emanating from the Jeep. Body camera footage shows the officers approaching the vehicle, speaking with both people in the vehicle, instructing Armstrong to get out of the vehicle, and ultimately finding a gun under the front passenger's seat. As a result, Armstrong was charged with carrying a concealed weapon, MCL 750.227, being a felon in possession of a firearm (felon in possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b.

In response, Armstrong moved to suppress the gun as the fruit of a search that violated the Fourth Amendment to the United States Constitution. In the trial court, both parties several times

declined an invitation to hold an evidentiary hearing, stipulating instead to the use of body camera footage as the evidentiary basis upon which the trial court should resolve Armstrong's suppression motion. Additionally, although no police reports concerning the search and seizure were filed in the trial court, the parties included quotes from the police reports in their briefs, so the trial court considered those excerpts from the police reports. Relying upon that limited record, the trial court described the factual background of the suppression motion in the following terms:

On October 8, 2020, Corporal Eaton and Officers Genaw, Saad, Scott, and Krzyak were driving down Seneca street in the city of Detroit to conduct a home compliance check. Corporal Eaton observed a black Jeep Cherokee parked on Seneca street, with a woman in the driver's seat and Armstrong in the front passenger seat. According to Corporal Eaton, she smelled the scent of burnt marijuana as she drove past the black Jeep Cherokee. She parked her vehicle then walked behind the black Jeep Cherokee, exited, and approached the car. The prosecution's brief in support alleges that when Corporal Eaton asked Armstrong about the scent of marijuana, she observed a black handgun lying on the floorboard of the vehicle directly in front of Armstrong. Prosecution also makes note that Corporal Eaton noticed Armstrong's hand shaking when he was being questioned. With the parties' consent to rely on the body camera footage as evidence of the initial interaction between Corporal Eaton, the driver of the vehicle, and Armstrong, the dialogue is detailed below:

[*Corporal Eaton*]: How—long you been smoking weed in the car? I can smell it from outside. Don't act shocked. I can smell it.

[*Defendant*]: I just . . . she just pulled up on me.

[*Corporal Eaton*]: (To driver:) Ok. How much weed you been smoking in the car?

*Driver*: Yeah, I'm not smoking. There's no weed in the car.

[*Corporal Eaton*]: There might not be any now, but you were—you were, right?

*Driver*: No. Not—

[*Corporal Eaton*]: I can smell it. I mean it's ok, you're not doing it now . . . but I can smell it. Do you know who uh Tony Williams is?

*Driver*: No, I just pulled up—

[*Corporal Eaton*]: Where do you guys . . . I mean which house?

[*Defendant*]: Right there third one.

[*Corporal Eaton*]:  The—?

[*Defendant*]:  Third.

[*Corporal Eaton*]:  Oh the third one, I thought you said the gray one.  Do you have ID sir?  Could you step out for me?

Immediately after Corporal Eaton asked Armstrong to step out of the vehicle, she searched his person and put him in handcuffs.  During the search of Armstrong's person, Corporal Eaton's body camera fell off and obstructed the view until it was retrieved by one of the officers on the scene.  Ofc. Genaw stated in her report that "as [Corporal Eaton] began removing him from the vehicle, I observed a black handgun with an extended magazine under the front passenger seat."  Ofc. Genaw began to search the passenger side of the vehicle.  When Corporal Eaton walked away with Armstrong in handcuffs, Ofc. Genaw asked from a distance, "do you have a CPL Sir?"  At this point, Corporal Eaton was on the other side of the vehicle with Armstrong and two other officers.  She told the other officers that Armstrong had a gun in the car.  Corporal Eaton then walked back over to Ofc. Genaw, who was still searching the passenger side of the vehicle, and said, "let's see it real quick," referring to the handgun.  When Corporal Eaton saw it, she stated, "oh nice," as if it was her first time seeing the handgun.  [Record citations omitted.]

During the hearing on the motion to suppress, the prosecution argued that: (1) the smell of marijuana, standing alone, provided probable cause to approach the Jeep; and (2) the gun found in the Jeep was in plain view when Corporal Eaton approached the passenger window.  Accordingly, no warrant was required to seize the gun.  Defendant argued that the smell of marijuana alone was not sufficient to establish probable cause to approach defendant and, therefore, all evidence found during the search of the Jeep should be suppressed.  The trial court granted defendant's motion to suppress the evidence and dismissed the case.  In its opinion, the trial court found that defendant's encounter with the law-enforcement officers was a seizure, requiring the officers to have probable cause *before* ordering defendant out of the Jeep and arresting him because the officers surrounded the vehicle and effectively prevented the driver from leaving.  The trial court also determined that the smell of marijuana alone neither constituted probable cause nor justified defendant's removal from the Jeep or the officers' search of the vehicle.  Finally, the trial court found that the gun was not permissibly obtained under the plain-view exception to the warrant requirement because, based upon the footage from the body camera, "the firearm was not visible until [defendant] had already been removed from the vehicle."  The prosecution now appeals the trial court's decision.

## II.  LEGAL ANALYSIS

On appeal, the prosecution has challenged the trial court's suppression of the gun obtained after defendant was ordered to get out of the vehicle.  According to the prosecution, "[t]he facts of this case . . . show that during the investigation of a civil infraction committed within the presence of a police officer, a firearm was discovered."  More specifically, the prosecution asserts that the smell of burned marijuana and the totality of the circumstances rendered Corporal Eaton's actions reasonable, so the gun was properly seized under the plain-view doctrine.  Our analysis of the trial court's decision involves two standards of review, one concerning the trial court's factual findings

and another concerning its application of the law. "This Court's review of a lower court's factual findings in a suppression hearing is limited to clear error, and those findings will be affirmed unless we are left with a definite and firm conviction that a mistake was made." *People v Simmons*, 316 Mich App 322, 325; 894 NW2d 86 (2016) (quotation marks and citation omitted). Thus, " '[t]he trial judge's resolution of a factual issue is entitled to deference[.]' " *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999). We must review de novo the trial court's application of the law and "ultimate decision on a motion to suppress." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). Similarly, we review "de novo whether the Fourth Amendment was violated and whether an exclusionary rule applies." *Id*.

## A. SEIZURE OF DEFENDANT ARMSTRONG

First, we must determine whether law-enforcement officers seized defendant on October 8, 2020, and, if so, whether the seizure satisfied constitutional standards. Both the United States and Michigan Constitutions guarantee the right against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. Our Supreme Court has explained that "the Michigan Constitution is to be construed to provide the same protection as that secured by the Fourth Amendment, absent compelling reason to impose a different interpretation." *People v Slaughter*, 489 Mich 302, 311; 803 NW2d 171 (2011) (quotation marks and citations omitted). Searches and seizures, according to the United States Constitution and the Michigan Constitution, must "be conducted reasonably, and in most cases that requires issuance of a warrant supported by probable cause, in order for the results to be admissible." *People v Toohey*, 438 Mich 265, 270; 475 NW2d 16 (1991).

The prosecution contends that Corporal Eaton "was well within her authority to approach defendant, who was sitting in a car parked on a public street, and simply talk to him." This theory, however, collapses under the weight of the facts that the prosecution generally does not dispute. Although an officer may approach a person in a public area, the encounter is only consensual if "a reasonable person would feel free to terminate the encounter." *People v Anthony*, 327 Mich App 24, 39; 932 NW2d 202 (2019) (quotation marks and citation omitted). A person is seized whenever law-enforcement "officers completely block a person's parked vehicle[.]" *Id*. at 40. Here, the trial court found (and the body camera footage reveals) that the Jeep "was surrounded on all sides and front and back by Corporal Eaton and Officers Genaw, Saad, Scott, and Krzyak." Corporal Eaton's body camera footage shows four other police officers around the Jeep when Corporal Eaton parked behind it and then approached it on foot. When Corporal Eaton instructed defendant to get out of the Jeep, officers were standing in front of the Jeep, Corporal Eaton was standing on its passenger side, and two other officers were standing on the driver's side. To be sure, our review of the body camera footage does not unmistakably establish that the driver of the Jeep could not have driven forward without hitting an officer. But our cautious uncertainty on this point does not rise to the level of a "definite and firm conviction that a mistake was made" by the trial court. *Simmons*, 316 Mich App at 325. Thus, faithfully applying the trial court's factual finding that the parked Jeep was completely blocked by police officers, we conclude that a reasonable person in defendant's position would not have felt free to terminate or leave the encounter. See *Anthony*, 327 Mich App at 40. In other words, the officers seized defendant even before Corporal Eaton ordered him out of the Jeep.

Still, the prosecution insists that the officers had probable cause to approach the Jeep and seize defendant. Specifically, the prosecution argues that the officers were justified in approaching the Jeep based upon their belief that defendant was smoking marijuana in a vehicle because he was in the Jeep parked on a public street and the officers could smell burned marijuana. In support of this theory, the prosecution cites *People v Davis*, 250 Mich App 357, 363; 649 NW2d 94 (2002), which held that "[s]o long as the officer has probable cause to believe the [infraction] has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." In this case, the trial court found (and the body camera footage confirms) that Corporal Eaton first approached the Jeep because "she smelled the scent of burnt marijuana as she drove past the black Jeep Cherokee." But the body camera footage does not show any smoke emanating from the Jeep. Nor does the footage show defendant or the driver throwing any marijuana remnants from the Jeep. When asked, defendant and the driver both denied they were smoking marijuana. Indeed, although the prosecution asserts that Corporal Eaton observed marijuana being used in a vehicle on a public street, Corporal Eaton only mentioned that she *smelled* marijuana. Accordingly, the trial court did not clearly err in finding that Corporal Eaton based her decision to approach the Jeep solely upon her stated smell of marijuana.

When marijuana was illegal for all purposes under Michigan law, our Supreme Court ruled that the " 'very strong smell of marijuana emanating from [a] vehicle' " furnished "probable cause to search for marijuana[.]" *People v Kazmierczak*, 461 Mich 411, 421-422; 605 NW2d 667 (2000). Much has changed, however, in the 22-year period since that decision was rendered. The Michigan Regulation and Taxation of Marihuana Act (MRTMA), MCL 333.27951 *et seq*., that was approved by voters in 2018 (prior to Armstrong's encounter with the officers) generally decriminalized use and possession of marijuana by adults aged 21 years or older. See MCL 333.27952. Under the MRTMA, adults may possess up to 2.5 ounces of marijuana. See MCL 333.27955(1)(a). But the MRTMA does not allow the use of marijuana in a public area, MCL 333.27954(1)(e), or "smoking marihuana within the passenger area of a vehicle upon a public way[,]" MCL 333.27954(1)(g), or operating a vehicle while under the influence of marijuana, MCL 333.27954(1)(a). Thus, analysis of search-and-seizure law is now much more complicated and nuanced than it was when marijuana was unlawful in all circumstances in Michigan. Arnold, *Criminal Law Issues After Passage of the MRTMA: Uncertainty Remains*, 100 Mich B J 26, 29-30 (June 2021).

Since the passage of the MRTMA, we have not established whether, by itself, the smell of marijuana furnishes probable cause to approach or seize a person without a warrant. Still, recent cases decided before the passage of the MRTMA help to distinguish defendant's case and establish the need for probable cause beyond the smell of marijuana alone. In *People v Moorman*, 331 Mich App 481, 487-488; 952 NW2d 597 (2020), the smell of burned marijuana was not the only factor supporting an officer's probable cause to seize, and later search, the defendant's vehicle without a warrant. In *Moorman*, after the defendant was stopped for a traffic violation, the defendant denied possessing marijuana in response to a question from the officer, but the defendant later admitted that he harvested marijuana earlier that day and that he had a valid registry card under the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq*. See *id*. at 483-484. The *Moorman* Court held that the smell of marijuana *combined with* the defendant lying about his legal possession justified removing the defendant from the vehicle and searching the defendant's vehicle without a warrant. *Id*. at 487-488.

In *Anthony*, 327 Mich App at 43, the smell of marijuana by itself provided probable cause for police officers to approach the defendant's vehicle on a public street. The *Anthony* Court relied on *Kazmierczak* for the proposition that the "odor of contraband, standing alone, can be sufficient to justify a finding of probable cause if smelled by a qualified person." *Anthony*, 327 Mich App at 42. The encounter in *Anthony*, however, took place before the MRTMA was passed. See *id*. at 45 n 11. Therefore, the possession and use of any quantity of marijuana was illegal when the search in *Anthony* occurred. Here, in contrast, possession and use of marijuana had generally been decriminalized long before Corporal Eaton approached defendant and searched the Jeep. See MCL 333.27955(1)(a). Indeed, the *Anthony* Court stated that, although it ultimately did not so hold for the defendant in that case, it had the "authority to consider not adhering to *Kazmierczak*'s holding" if the statute in question, i.e., the MMMA, "changed the law and thereby undermined the basis for *Kazmierczak*." *Anthony*, 327 Mich App at 44. As the *Anthony* Court noted, we are bound to follow Michigan Supreme Court decisions "except where those decisions have clearly been overruled or superseded." *Id*. (quotation marks and citation omitted). And as the *Anthony* Court reasoned, the context for the word "superseded" includes "legislative actions that change the state of the law." *Id*.

Passage of the MRTMA decriminalized possession and use of marijuana in Michigan. We conclude that this action changed the law concerning possession and use of marijuana, superseding otherwise-binding decisions that the smell of marijuana, without more, provides probable cause to search for marijuana. Therefore, in light of the MRTMA, we conclude that *Kazmierczak* no longer governs our analysis of whether the smell of marijuana, standing alone, constitutes probable cause to search for that substance. See *id.* at 45-46 n 11. As a result, we must chart our own path across the new legal landscape created by the MRTMA.

The advent of marijuana decriminalization has spawned conflicting approaches to analysis of the smell of marijuana in the calculus of probable cause. The emerging majority approach holds that, after decriminalization of marijuana, the smell of marijuana, standing alone, does not establish probable cause for a search of a vehicle or a command to the occupants to get out the vehicle. See, e.g., *Commonwealth v Cruz*, 459 Mass 459, 472; 945 NE2d 899 (2011); *People v Johnson*, 50 Cal App 5th 620, 629; 264 Cal Rptr 3d 103 (2020). The minority view states "that a law enforcement officer has probable cause to search a vehicle where the law enforcement officer detects an odor of marijuana emanating from the vehicle [if] marijuana in any amount remains contraband[.]" See *Robinson v State*, 451 Md 94, 99; 152 A3d 661 (2017). But the most persuasive approach comes from the courts that have staked out the middle ground by concluding that "the smell of marijuana may be a factor, but not a stand-alone one, in determining whether the totality of the circumstances established probable cause to permit a police officer to conduct a warrantless search of a vehicle" or to seize a driver or passenger found in the vehicle. *Commonwealth v Barr*, 266 A2d 25, 28 (Pa 2021). Under this approach, "the odor of marijuana is relevant to the totality of the circumstances test and can contribute to a probable cause determination[,]" *People v Zuniga*, 372 P2d 1052, 1054 (Colo 2016), but the smell of marijuana, by itself, does not give rise to probable cause unless it is combined with other factors that bolster the concern about illegal activity that may flow from the smell of marijuana. We adopt this middle-ground approach as the most compatible with Michigan law in the wake of the passage of the MRTMA. See *Moorman*, 331 Mich App at 487-488.

The prosecution has anticipated our middle-ground approach by contending that additional facts coupled with the smell of marijuana constituted probable cause to justify removing defendant

from the Jeep and searching the vehicle without a warrant. Specifically, the prosecution points out that: (1) defendant's hands were shaking when the police spoke with him; (2) he gave inconsistent answers about where he lived; and (3) he leaned down as Corporal Eaton approached the vehicle. But those facts identified as suspicious by the prosecution all surfaced after Armstrong was seized when the parked Jeep was boxed in by the officers on the scene. *Anthony*, 327 Mich App at 40 ("only if officers completely block a person's parked vehicle . . . is the person seized"). Therefore, the trial court correctly found that "Corporal Eaton approached the parked car that Armstrong was in *and she did so solely on the basis that she smelled marijuana emanating from the vehicle*." (Emphasis added.) Accordingly, although we readily acknowledge that the smell of marijuana— like many other factors—can be considered in the calculus of probable cause, *Moorman*, 331 Mich App at 487-488, no other factor may be permissibly considered in this case to decide whether law-enforcement officers had probable cause to seize defendant and search the Jeep. For that reason, we conclude that the trial court properly determined that defendant was unconstitutionally seized, so all of the evidence obtained after that unconstitutional seizure must be suppressed.

## B. SEIZURE OF THE GUN

The prosecution insists that even if the seizure of Armstrong was constitutionally suspect, law-enforcement officers permissibly seized the gun in the Jeep under the plain-view exception to the warrant requirement. The prosecution contends that Corporal Eaton saw the gun in plain view when she first approached the vehicle, so the subsequent seizure of Armstrong has no bearing upon the validity of the seizure of the gun. "While many warrantless searches are unreasonable pursuant to the warrant requirement, the United States Supreme Court has articulated several instances in which warrantless searches are reasonable." *Slaughter*, 489 Mich at 311 (citation omitted). One example is the plain-view doctrine, which "allows police officers to seize, without a warrant, items in plain view if the officers are lawfully in a position from which they view the item, and if the item's incriminating character is immediately apparent." *People v Champion*, 452 Mich 92, 101; 549 NW2d 849 (1996).

In this case, Armstrong was unlawfully seized when law-enforcement officers surrounded the Jeep without probable cause. Thus, any object such as a gun that was not immediately apparent as contraband to the officers before they surrounded the Jeep was not permissibly seized under the plain-view doctrine. In the body camera footage, Corporal Eaton can be heard stating on several occasions after defendant was arrested that, as she approached defendant from the rear of the Jeep, she saw him dip down and drop a gun on the floor of the vehicle. But no gun is visible in the body camera footage. In fact, defendant does not come into view until Corporal Eaton approaches the front passenger door from the rear of the Jeep. In the trial court's view, the quotes from the police reports and the body camera footage suggest that the gun was not discovered until after defendant got out of the Jeep in response to the officers' instructions. The trial court determined as a matter of fact that Corporal Eaton and Officer Genaw did not "discover any contraband prior to a search of [defendant's] person and the vehicle," and that Officer Genaw initially discovered the gun under the passenger seat after defendant was out of the Jeep.

Corporal Eaton's body camera footage does not leave us with a definite and firm conviction that the trial court erred in its factual determination on the timing issue. Despite the prosecution's assertion that Corporal Eaton saw defendant lean down in his seat as Corporal Eaton approached the vehicle, defendant's movements are unclear to us. To be sure, in her report, which the parties

cited in their briefs on the motion, Officer Genaw stated that as Corporal Eaton "began removing defendant from the vehicle, I observed a black handgun with an extended magazine *under* the front passenger seat." (Emphasis added.) The body camera footage makes it clear that Officer Genaw saw the gun after defendant had been removed from the vehicle: her demeanor changed and she then ordered the driver to put her hands on the steering wheel. In contrast, when Corporal Eaton ordered defendant out of the Jeep, she frisked him in a location where he would have been able to reach the gun. This suggests that she may not have known the gun was there before defendant got out of the Jeep. And as the trial court explained, after Corporal Eaton moved defendant away from the vehicle, she walked back to Officer Genaw, who was still searching the passenger side of the vehicle, and said "let's see it real quick." After she was shown the gun, Corporal Eaton responded by stating, "oh nice." The trial court interpreted these statements to mean that Corporal Eaton only then saw the gun for the first time, and we have no reason to describe that interpretation as clearly erroneous. Moreover, Corporal Eaton did not mention a gun or question defendant about one until after defendant was out of the Jeep and Officer Genaw asked defendant if he had a concealed pistol license. Furthermore, Officer Genaw stated in her police report that she found the " 'handgun with an extended magazine under the front passenger seat.' " In the body camera footage, a gun is not visible on the floor area of the passenger seat when Corporal Eaton walked over to look at the gun after Officer Genaw's search. Therefore, as the fact-finder, the trial court did not clearly err when it found that this was the first time Corporal Eaton saw the gun.

In sum, based on the limited factual record to which the parties stipulated in the trial court, no finding of fact made by the trial court is clearly erroneous. Therefore, we shall uphold the trial court's finding of fact that "the firearm was not visible until Armstrong had already been removed from the vehicle." Because the gun was not in plain view before defendant was unconstitutionally seized, the prosecution has provided no exception to the warrant requirement that justifies seizure of the gun. Accordingly, the trial court properly granted defendant's motion to suppress the gun, thereby making dismissal of the charges against defendant appropriate.

Affirmed.

/s/ Christopher P. Yates
/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto