# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ROBERT A. JOHNSON,

      Defendant-Appellant.

UNPUBLISHED
September 13, 2018

No. 329742
Ontonagon Circuit Court
LC No. 14-000098-FH

Before: MURRAY, C.J., and CAMERON and LETICA, JJ.

PER CURIAM.

In this interlocutory appeal, defendant appeals, pursuant to an order of remand from our Supreme Court in *People v Johnson*, 501 Mich 1023 (2018), the trial court's opinion and order denying his motion to dismiss a charge of delivery/manufacture of more than 5 but less than 45 kilograms of marijuana, MCL 333.7401(2)(d)(*ii*), based on his claim of immunity and affirmative defense under the Michigan Medical Marihuana[1] Act (MMMA), MCL 333.26421 *et seq*. For the reasons stated below, we affirm.

## I. FACTUAL BACKGROUND

Defendant became a patient under the MMMA in 2009 and a caregiver in 2010. He resides on the second floor of a building that formerly functioned as a motel. His son resides in a converted room on the first floor of the same motel. Defendant's main "grow operation" is in a greenhouse behind the building. He also grows plants in two of the old motel rooms and maintains a "cloner" in his son's room.[2] Defendant leased a mobile home on the property to Michael Lehto, who is also a medical marijuana caregiver. The mobile home bears its own address, but it appears that Lehto does not live there. Rather, he grew marijuana plants in and behind the mobile home. Defendant and Lehto helped one another with each other's grow operations.

---

[1] We will use the conventional spelling of marijuana.

[2] According to defendant, a cloner room is a place where cuttings from a marijuana plant "are placed in order to develop root systems for a future plant."

On August 20, 2014, Michigan State Police Detective Jason Sleeter, a member of the Upper Peninsula Substance Enforcement Team, and a "Detective Sergeant Koski" were conducting "Medical Marijuana grow checks." The detectives stopped at defendant's residence. Detective Sleeter testified that, from the roadway, he was able to view marijuana plants behind what "looked like an old motel." The detectives made contact with defendant, who denied them access to the property without a search warrant. Detective Sleeter said that defendant presented to him an expired medical marijuana patient card and separate caregiver cards for two of defendant's patients. In an affidavit submitted in request for a search warrant, Detective Sleeter stated in part that he had observed marijuana plants growing on the property, that defendant had stated that he was a medical marijuana caregiver who had a "secure facility," and that defendant had presented to him an expired card. Detective Sleeter averred that there was reason to believe that a search would reveal violations of the Controlled Substance Act and the MMMA. On September 16, 2014, a search warrant was issued.

On September 17, 2014, Detective Sleeter and other law enforcement officers executed the search warrant. They seized 130 marijuana plants. Defendant maintained that he was a caregiver for himself and five patients, allowing him to possess 72 marijuana plants. While defendant presented a valid patient card, his "paperwork" showed that cards for "two or three" of his patients had been denied. Lehto and his one patient were also present at the scene. Detective Sleeter explained that Lehto's plants were attributed to defendant because the two men had access to each other's plants. Law enforcement also found and seized approximately 15 pounds of processed marijuana. A significant amount of this marijuana was a "finely chopped" leafy substance that field tested positive for marijuana. Defendant was arrested for possessing more marijuana than he was authorized to have under the MMMA.

Defendant filed a motion in the trial court to quash the search warrant and dismiss the information. He argued that Detective Sleeter's affidavit was insufficient to establish probable cause for a search warrant. Specifically, he contended that Detective Sleeter's observation that there was marijuana growing on the property did not establish probable cause for the search. Further, defendant contended that Detective Sleeter's averment that defendant had presented an expired card did not support a finding of probable cause. Defendant also asserted that he had presented a valid patient card and that it was the caregiver cards that were expired. After a hearing at which defendant presented a patient card that was valid on the subject date, the trial court denied defendant's motion. The court reasoned that, pursuant to *People v Brown*, 297 Mich App 670; 825 NW2d 91 (2012), Detective Sleeter's affidavit only needed to establish probable cause that contraband would be found on the property.

Defendant subsequently filed a motion to dismiss the charge based on Section 4 immunity under the MMMA. He also moved for an evidentiary hearing, asserting a Section 8 defense under the MMMA. At the evidentiary hearing that followed, defendant's caregiver cards for the five patients he was purportedly growing marijuana for on September 17, 2014, were admitted into evidence. Three of the cards were issued to defendant in December 2014. Defendant testified that he possessed 59 plants and 10 to 12 ounces of usable marijuana on the day of the search. He explained that the finely chopped marijuana found by law enforcement was "trimmings" or "scraps" of marijuana leaves. Defendant opined that the trimmings were unusable, but that they could be used to create "Rick Simpson oil," which he testified was given to his patients who had cancer. Four of defendant's patients testified, in part, to their underlying

medical condition and to how long defendant had been their caregiver. Dr. Larry Carlyon, the certifying doctor for defendant and three of the patients, testified to his relationship with those patients and the examinations he performed before certifying them as qualified patients.

The trial court denied defendant's claims of Section 4 immunity and the Section 8 affirmative defense. With respect to Section 4, the trial court found, based on defendant's caregiver cards, that on September 17, 2014, defendant was the primary caregiver for only two of the patients. The three remaining patients did not have valid medical marijuana cards until December 2014. Therefore, the court reasoned, defendant could only possess 36 plants.[3] Regarding Section 8, the trial court determined that there were questions of fact, and defendant could present evidence to the jury in support of the affirmative defense.

## II. ANALYSIS

## A. SECTION 4 IMMUNITY

Defendant first argues that the trial court erred in ruling that he failed to prove that he was entitled to Section 4 immunity. We disagree. The trial court correctly determined that, at the time of the arrest, defendant possessed more than the authorized amount of marijuana plants and usable marijuana in violation of the MMMA.

Prior to trial, the trial court decides as a question of law whether a defendant has met the elements of a Section 4 immunity claim under the MMMA. *People v Hartwick*, 498 Mich 192, 212-213; 870 NW2d 37 (2015). We review the trial court's factual findings relating to Section 4 immunity for clear error and the legal determinations de novo. *People v Tackman*, 319 Mich App 460, 468; 901 NW2d 638 (2017). We also review de novo questions of statutory interpretation. *People v Manuel*, 319 Mich App 291, 299; 901 NW2d 118 (2017). "The intent of the electors, rather than the Legislature, governs the interpretation of voter-initiated statutes like the MMMA." *People v Jones*, 301 Mich App 566, 572; 837 NW2d 7 (2013). "A statute must be interpreted on the basis of its plain language, and the words of the MMMA must be given their ordinary and plain meaning as would have been understood by the electorate." *Id.*

"The possession, manufacture, use, creation, and delivery of marijuana remain illegal in this state, even after the enactment of the MMMA." *Brown*, 297 Mich App at 677. The medical use of marijuana is legal if it complies with the MMMA's provisions. MCL 333.26427(a); see also *Hartwick*, 498 Mich at 209. "Sections 4(a) and 4(b) of the MMMA contain parallel immunity provisions that grant registered qualifying patients and registered primary caregivers broad immunity from arrest, criminal prosecution, civil penalties, and disciplinary actions." *Jones*, 301 Mich App at 573.

On appeal, defendant claims immunity under Section 4(b), which, at the time this case was decided, provided in relevant part:

---

[3] Although the trial court found that ruling dispositive, it also found that defendant failed to store his marijuana plants in an enclosed, locked facility as required by Section 4.

(b) A primary caregiver who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for assisting a qualifying patient to whom he or she is connected through the department's[4] registration process with the medical use of marihuana in accordance with this act. The privilege from arrest under this subsection applies only if the primary caregiver presents both his or her registry identification card and a valid driver license or government-issued identification card that bears a photographic image of the primary caregiver. This subsection applies only if the primary caregiver possesses an amount of marihuana that does not exceed:

(1) 2.5 ounces of usable marihuana for each qualifying patient to whom he or she is connected through the department's registration process; and

(2) for each registered qualifying patient who has specified that the primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility; and

(3) any incidental amount of seeds, stalks, and unusable roots. [MCL 333.26424, as amended by 2012 PA 512.[5]]

A defendant claiming Section 4 immunity must prove by a preponderance of the evidence that he or she

(1) was issued and possessed a valid registry identification card,

(2) complied with the requisite volume limitations of § 4(a) and § 4(b),

(3) stored any marijuana plants in an enclosed, locked facility, and

(4) was engaged in the medical use of marijuana. [*Hartwick*, 498 Mich at 217-218.]

Defendant argues that the trial court erred by determining he was only allowed to possess marijuana for himself and two of his patients. Whether defendant complied with the MMMA's volume limitations requires a determination of (1) the number of qualified patients that defendant was connected with through LARA's registration process, and (2) whether they had specified that defendant would be allowed to possess marijuana plants on their behalf.

---

[4] " 'Department' means the department of licensing and regulatory affairs [(LARA)]." MCL 333.26423(c).

[5] The subsequent amendments to Section 4 are not relevant to our resolution of this appeal. See 2016 PA 283. Therefore, we need not decide whether to apply PA 283 retroactively.

Section 6 of the MMMA sets forth "requirements for issuance of a registry identification card." *Jones*, 301 Mich App at 579 n 6. " 'Registry identification card' means a document issued by the department that identifies a person as a registered qualifying patient or registered primary caregiver." MCL 333.26423(m). To receive a registry identification card, a qualifying patient must include identifying information pertaining to the "qualifying patient's primary caregiver, if any." MCL 333.26426(a)(5). "If the qualifying patient designates a primary caregiver," LARA must include "a designation [on the registry identification card] as to whether the qualifying patient or primary caregiver will be allowed under state law to possess marihuana plants for the qualifying patient's medical use." MCL 333.26426(a)(7). "The department shall issue a registry identification card to the primary caregiver, if any, who is named in a qualifying patient's approved application[.]" MCL 333.26426(d). Based on the above, we conclude that, for a caregiver to be connected with a qualifying patient through LARA's registration process, the patient must designate that person as his or her primary caregiver. The number of qualifying patients that the caregiver is connected to determines the amount of usable marijuana that the primary caregiver can possess. See MCL 333.26424(b)(1). But the number of plants that a primary caregiver can possess is determined by the qualifying patients who have taken the additional step and specified that the caregiver will be allowed to cultivate[6] marijuana on their behalf. See MCL 333.26424(b)(2).

Based on defendant's caregiver cards, it is undisputed that he was not validly registered as the primary caregiver for three of his claimed patients on September 17, 2014. The three patients' cards were not issued until December 3, 2014, December 8, 2014, and December 12, 2014, respectively. Defendant suggests that this fact is not dispositive. He notes that the applications for the three patients were "in progress" at the time of the search and seizure. Even assuming this is true, we construe the phrase "connected through the department's registration process" to mean that LARA has approved the application designating a primary caregiver. LARA has discretion to deny an application or renewal "if the applicant did not provide the information required pursuant to this section, or if the department determines that the information provided was falsified." MCL 333.26426(c). There are also requirements for a person serving as a primary caregiver; that person must be 21 years old and not have been convicted of a felony in the past 10 years and cannot have been "convicted of a felony involving illegal drugs or a felony that is an assaultive crime as defined in section 9a of chapter X of the code of criminal procedure, 1927 PA 175, MCL 770.9a." MCL 333.26423(k). Further, a patient can only have one primary caregiver and a primary caregiver can only serve in that capacity for five patients. MCL 333.26426(d). These requirements would be meaningless if a Section 4 claim could be maintained before LARA has approved the application. Courts should avoid interpretations that would render part of the statute meaningless. *People v Pinkney*, 501 Mich 259, 282-283; 912 NW2d 535 (2018).

---

[6] It is unclear why Section 4 refers to patients specifying that caregivers can *cultivate* plants on their behalf when Section 6, pertaining to the registration process, contemplates that patients will specify whether caregivers can *possess* plants on their behalf. The Michigan Supreme Court has noted that there are "many inconsistencies" in the MMMA. *Hartwick*, 498 Mich at 200.

Further, registration matters under Section 4. The first element of an immunity claim is that the primary caregiver has a valid registry identification card. In contrast, "[s]ection 8(a) of the MMMA provides any patient or primary caregiver—*regardless of registration with the state*—with the ability to assert an affirmative defense to a marijuana-related offense." *Hartwick*, 498 Mich at 226 (emphasis added). It follows that LARA must actually approve a patient's application for a primary caregiver to possess marijuana on that patient's behalf under Section 4.

Defendant also argues that the MMMA does not require that a caregiver's patients have an updated card or that the caregiver know of the status of the patient's card. However, the MMMA provides that registry identification cards "expire 2 years after the date of issuance," MCL 333.26426(e), and the act contemplates that patients will seek renewal of their cards. See e.g., 333.26425(b). Further, a caregiver's knowledge of the patient's card status is irrelevant under Section 4. The volume limitations are determined by LARA's registration process.

On the day of the search and arrest, defendant, a qualified patient, only had valid caregiver cards for two patients. Accordingly, at that time, defendant was allowed to possess 7.5 ounces of usable marijuana and 36 marijuana plants. MCL 333.26424(b)(1) and (b)(2). By his own testimony, defendant was in possession of 10 to 12 ounces of usable marijuana and 59 plants on the day of his arrest. Therefore, he failed to comply with the MMMA's volume limitations, and the trial court did not err in denying his claim of immunity under Section 4. We decline to address defendant's other arguments pertaining to Section 4. See *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998) ("As a general rule, an appellate court will not decide moot issues.").

## B. SECTION 8 AFFIRMATIVE DEFENSE

Next, defendant argues that the trial court erred in determining that there were questions of fact regarding his Section 8 claim that must be submitted to a jury. We disagree.

"A defendant seeking to assert the MMMA's statutory affirmative defense must present prima facie evidence for each element of § 8(a)." *Hartwick*, 498 Mich at 228. "[I]f a defendant establishes these elements and no question of fact exists regarding these elements, then the defendant is entitled to dismissal of the criminal charges." *Id*. at 227. If there are questions of fact, the affirmative defense must be presented to the jury. *Id*. If the defendant fails to present prima facie evidence regarding each element from which a reasonable juror could find that Section 8's elements have been satisfied, then the trial court must deny the motion to dismiss and the defendant is precluded from submitting the defense to the jury. *Id*.

> Except as provided in section 7(b),[7] a patient and a patient's primary
> caregiver, if any, may assert the medical purpose for using marihuana as a defense

---

[7] The unprotected activities identified in Section 7 are not pertinent to this case. See MCL 333.26427.

to any prosecution involving marihuana, and this defense shall be presumed valid where the evidence shows that:

(1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

(2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition. [MCL 333.26428(a).]

Section 8(a)(1) contains three elements: "(1) [t]he existence of a bona fide physician-patient relationship,"[8] "(2) in which the physician completes a full assessment of the patient's medical

---

[8] Originally the term "bona fide physician-patient relationship" was undefined. *People v Kolanek*, 491 Mich 382, 396 n 30; 817 NW2d 528 (2012). Effective April 1, 2013, the Legislature amended the MMMA to include a definition of the term.

(a) "Bona fide physician-patient relationship" means a treatment or counseling relationship between a physician and patient in which all of the following are present:

(1) The physician has reviewed the patient's relevant medical records and completed a full assessment of the patient's medical history and current medical condition, including a relevant, in-person, medical evaluation of the patient.

(2) The physician has created and maintained records of the patient's condition in accord with medically accepted standards.

(3) The physician has a reasonable expectation that he or she will provide follow-up care to the patient to monitor the efficacy of the use of medical marihuana as a treatment of the patient's debilitating medical condition.

history and current medical condition," and "(3) from which results the physician's professional opinion that the patient has a debilitating medical condition and will likely benefit from the medical use of marijuana to treat the debilitating medical condition." *Hartwick*, 498 Mich at 229.

The trial court found that defendant satisfied Section 8(a)(1) with respect to himself and one of the validly registered qualifying patients. The trial court found the evidence inadequate with respect to the other validly registered qualifying patient, whose doctor did not testify. Contrary to defendant's argument, the trial court did not rule that the doctor's testimony was necessary. Rather, it ruled that the patient's testimony was sufficient to satisfy Section 8(a)(1). We find no error in that determination. Although the patient's testimony established a long-standing relationship with the certifying doctor, the trial court was left to speculate regarding whether the doctor adequately reviewed the patient's medical history and current condition, or determined that the patient had a serious or debilitating medical condition such that the patient would benefit from the use of marijuana. Defendant asks that we presume that these elements were met, but the evidence does not show that he is entitled to that presumption.[9]

Next, defendant cites Dr. Carlyon's testimony about the three patients for whom defendant was not validly registered as a primary caregiver at the time of the arrest in support of his claim of error. But the trial court did not address that evidence for this precise reason, i.e., the lack of valid registration. Defendant does not address the trial court's ruling and therefore is not entitled to appellate relief. See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004). Further, to address whether the trial court erred on this matter, we would have to engage in statutory interpretation of Section 8 and the MMMA as a whole. But defendant does not address the finer points of this issue,[10] and we need not elaborate on defendant's arguments. See *People v Bosca*, 310 Mich App 1, 48; 871 NW2d 307 (2015). Further, this is an unpreserved issue that is not briefed by the parties. This Court "generally do[es] not address the merits of unbriefed issues." *People v Byrne*, 199 Mich App 674, 677; 502 NW2d 386 (1993). For these reasons, we decline to address whether the trial court erred by not considering the evidence pertaining to patients for whom defendant was not registered as the primary caregiver at the time of his arrest.

---

(4) If the patient has given permission, the physician has notified the patient's primary care physician of the patient's debilitating medical condition and certification for the use of medical marihuana to treat that condition. [MCL 333.26423(a)(1), (a)(2), (a)(3), (a)(4), as amended by 2012 PA 512.]

[9] A valid registry identification issued after April 2013 establishes the second and third components of this sub-element. *Hartwick*, 498 Mich at 203 n 10. The evidence shows that Livingston's patient card was issued in 2010.

[10] As noted, a patient's or caregiver's registration status is generally irrelevant under Section 8. *Hartwick*, 498 Mich at 226.

Defendant also argues that the trial court erred by finding that there were questions of fact pertaining to whether defendant possessed a reasonably necessary amount of marijuana. Again, the second element of a Section 8 defense requires the primary caregiver to show that

> [t]he patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition[.]   [MCL 333.26428(a)(2).]

"The critical phrase from the above quoted passage is 'reasonably necessary to ensure uninterrupted availability of marihuana [for treatment]. . . .' " *Hartwick*, 498 Mich at 233.  Our Supreme Court has advised that, to establish what that amount is, a primary caregiver would generally have to present testimony "regarding how much usable marijuana each patient required and how many marijuana plants and how much usable marijuana the primary caregiver needed in order to ensure each patient the 'uninterrupted availability' of marijuana." *Hartwick*, 498 Mich at 235.

On appeal, defendant focuses on the marijuana "trimmings" or "scraps" found on his property.  Defendant maintains that this was not usable marijuana, as he and other witnesses testified.  " 'Usable marihuana' means the *dried leaves*, flowers, plant resin, or extract of the marihuana plant, but does not include the seeds, stalks, and roots of the plant."  MCL 333.26423(n) (emphasis added).  Defendant's testimony established that the scraps were trimmed marijuana leaves.  Thus, the trimmings seized from defendant's property constitute usable marijuana.[11]

Alternatively, defendant asks us to conclude that the seized trimmings constituted a reasonable amount of marijuana under the circumstances.  We decline to do so and note that defendant overlooks many of the factual nuances in this case.  For instance, it appears that only one of defendant's patients used the Rick Simpson oil that would have been derived from the trimmings.  Further, the trial court also found that there were questions of fact regarding how many plants defendant possessed and how many plants he needed to possess to meet his client's needs. Defendant does not address this aspect of the court's ruling.  Accordingly, we cannot say that the trial court erred in ruling that there were questions of fact on defendant's Section 8 affirmative defense.

## C.  FOURTH AMENDMENT

Finally, defendant argues that the issuance of a search warrant in this case violated his Fourth Amendment rights.  We disagree.

---

[11] Defendant argues, for the first time, that the trimmings were not completely dried.  There was simply no testimony pertaining to whether the trimmings were dried.  Defendant cannot satisfy his burden to present prima facie evidence on this matter by speculating on appeal.

We review de novo whether the Fourth Amendment was violated. *People v Hyde*, 285 Mich App 428, 436, 438; 775 NW2d 833 (2009). In reviewing the outcome of a suppression hearing, which is apposite to this case, we review the trial court's factual findings for clear error. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014). (quotation marks and citation omitted). Questions of law relating to the motion to suppress are reviewed de novo. *Id.*

"[B]oth the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *Hyde*, 285 Mich App at 438 (quotation marks and citations omitted). "A search warrant may only be issued upon a showing of probable cause." *Brown*, 297 Mich at 675. "Probable cause to issue a search warrant exists if there is a substantial basis for inferring a fair probability that evidence of a crime exists in the stated place." *Id.* "Probable cause must be based on facts presented to the issuing magistrate by oath or affirmation." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). "When probable cause is averred in an affidavit, the affidavit must contain facts within the knowledge of the affiant rather than mere conclusions or beliefs." *Id.*

Defendant's overarching argument is that Detective Sleeter's affidavit did not establish probable cause because the affidavit did not allege facts establishing that defendant was in violation of the MMMA. But in *Brown*, 297 Mich App at 677, we concluded

> that to establish probable cause, a search-warrant affidavit need not provide facts from which a magistrate could conclude that a suspect's marijuana-related activities are specifically not legal under the MMMA. Probable cause exists if there is a substantial basis for inferring a fair probability that contraband or evidence of a crime exists in the stated place.

Defendant is correct that *Brown* is distinguishable. In *Brown*, the police officers were unaware that the defendant was a qualified patient under the MMMA when they sought and executed the search warrant. See *Brown*, 297 Mich App at 672-673, 674 n 2. In this case, the officers were aware that defendant was a caregiver under the MMMA. However, this distinction has no bearing on the binding rule of law announced in *Brown*. See MCR 7.215(J)(1); see also *People v Ventura*, 316 Mich App 671, 677-678; 894 NW2d 108 (2016) (applying *Brown*).

We reasoned in *Brown* "that because the possession, manufacture, use, creation, and delivery of marijuana remain illegal in Michigan even after the enactment of the MMMA, a search-warrant affidavit concerning marijuana need not provide specific facts pertaining to the MMMA[.]" *Id.* at 674-675. Defendant suggests that *Brown* is no longer valid because medical marijuana is now a schedule 2 substance under MCL 333.7213(b). However, "[m]arijuana remains a schedule 1 substance in Michigan's Public Health Code, MCL 333.7212(1)(c), and medical use of marijuana is not recognized as a legal activity at the federal level." *People v Kolanek*, 491 Mich 382, 394 n 24; 817 NW2d 528 (2012). We note that the MMMA provides that the possession of a registry identification card "shall not constitute probable cause or reasonable suspicion, nor shall it be used to support the search of the person or property of the person possessing . . . the registry identification card . . . ." MCL 333.26426(g). But Detective Sleeter did not seek a search warrant on the ground that defendant possessed a registry

identification card. Rather, he averred that he could see marijuana plants growing openly from the road and that defendant responded by telling him that he was a medical marijuana cardholder and that he had a "secured facility." Accordingly, the affidavit provided "a substantial basis for inferring a fair probability that contraband or evidence of a crime exists in the stated place." *Brown*, 297 Mich App at 677.

While this Court could affirm the trial court's ruling for this reason alone, we also conclude that there was a substantial basis in the affidavit for inferring that defendant was not in compliance with the MMMA.

According to Detective Sleeter, he observed the marijuana growing from the highway. Under the definition of an "enclosed, locked facility", marijuana plants can be grown outside "if they are not visible to the unaided eye from an adjacent property when viewed by an individual at ground level . . . ." MCL 333.26423(d). We agree with the trial court's determination that Detective Sleeter was at ground level when he was sitting in a truck. There is no requirement in the statute that a person be on foot. Defendant maintained that Detective Sleeter could not have seen the plants from 300 feet away, but Detective Sleeter did not testify as to how far away he was when he viewed the plants. And defendant's estimation was apparently based on a photograph viewing the *mobile home* from the road, but Detective Sleeter observed the plants behind the former *motel*. The trial court accepted that Detective Sleeter observed the plants, and defendant does not establish that this finding was clearly erroneous.

Detective Sleeter's affidavit was also based on defendant presenting an expired MMMA card. Defendant indicates that this statement is insufficient to establish probable cause that the MMMA was being violated. But the affidavit states that, in response to being informed that Detective Sleeter could view marijuana from the road, defendant stated that he was a MMMA cardholder and that he had a "secured facility." It can be inferred from the affidavit that defendant was growing marijuana with an expired card, and therefore was not in compliance with the MMMA.

Alternatively, defendant argues that he proved that his card was not expired. He presented his registry identification card, which was issued in February 2014 and expired in March 2016. Detective Sleeter maintained that defendant presented a card that expired in 2013. The trial court did not resolve this dispute.

Even if defendant had presented his valid patient card to Detective Sleeter, defendant admittedly presented Detective Sleeter two expired caregiver cards. Likely, the similarity of the cards was the source of confusion. The face of each the cards are nearly identical, with the caregiver cards having a "C" in the bottom right and the patient cards having a "P." "The defendant has the burden of showing, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with a reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to the finding of probable cause." *People v Ulman*, 244 Mich App 500, 510; 625 NW2d 429 (2001). "[T]here is a presumption that the affidavit supporting the search warrant is valid." *People v Martin*, 271 Mich App 280, 311; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008). In all likelihood, Detective Sleeter made a reasonable mistake in viewing the cards. In any event, defendant did not show that Detective Sleeter intentionally or recklessly inserted false material into the affidavit. Even if defendant

met that burden, Detective Sleeter's observation of the grow operation from the road provided a substantial basis for inferring that both the Controlled Substances Act and the MMMA were being violated. Thus, the statement relating to the expired card was not necessary to establish probable cause.

Affirmed.

/s/ Christopher M. Murray
/s/ Thomas C. Cameron
/s/ Anica Letica