*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 11, 2019

Plaintiff-Appellee,

v

No. 339325
Livingston Circuit Court

ANTOINE LEE SCOTT,

LC Nos. 16-023849-FH;
16-023850-FH;
16-023851-FH;
16-023853-FH

Defendant-Appellant.

Before: M. J. KELLY, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

After a rash of similar break-ins at the homes of people attending funerals, police in several Oakland County jurisdictions formed a special investigation unit to find the perpetrator. Information linked defendant Antoine Scott to the funeral-day burglaries. On a May morning in 2014, members of the unit followed Scott to a home in Northville. The unit knew that one of the homeowners had died, and that the deceased's wife would attend his funeral that day.

As a detective watched from a neighbor's driveway, Scott pulled his car up to the Northville home's garage door, got out, and rang the doorbell. No one answered. Scott retrieved black gloves and a pry bar from his vehicle and tried to open a door leading into the garage. When that effort failed, he attempted a window entry. Unsuccessful again, Scott readdressed the door and was able to pop it open with his pry bar. As the detective (now joined by other officers) looked on, Scott entered the home and spent 12 minutes inside. Scott exited with a "gigantic bulge" in his sweatshirt containing jewelry and coins. Scott told an officer that he targeted the Northville home "by looking up obituaries online off his phone." Scott received a probationary sentence for that home invasion, and for a similar crime in Washtenaw County.

Fast forward to 2015, Livingston County. Five home invasions occurred between May and August at the residences of people attending the funerals of loved ones. In all five cases, the perpetrator gained entry by using a pry bar. In all five cases, the perpetrator stole expensive jewelry and collectible coins, bypassing electronics and costume jewelry. In at least three of the five cases, the jewelry and coins were pawned at Michigan Cash for Gold in Detroit. Scott was identified by his thumbprint as the person who had pawned the valuables.

A Livingston County jury convicted Scott of having committed four of the five charged home invasions in that jurisdiction. Scott raises a number of appellate claims, including the ineffective assistance of counsel. Scott's counsel may have performed ineffectively by not requesting a *Daubert*[1] hearing regarding expert testimony related to the pry bar, but other evidence of his guilt was overwhelming. Even had the trial court excluded the challenged evidence on *Daubert* grounds, a different result was not reasonably probable. Scott's remaining claims also lack merit, and we affirm.

I

In August 2015, Michigan State Police Trooper Beth McLaughlin began investigating "home invasions occurring while the loved ones were away at a funeral." She learned that the suspect drove "a burnt orange Chrysler product," and was directed to surveil the Chelsea home of a family attending a funeral. McLaughlin staked out the house. She observed a "burnt orange Dodge Avenger" with dark tinted windows proceed slowly past the residence. McLaughlin effectuated a traffic stop. Scott was driving; he told McLaughlin that he had no driver's license. McLaughlin saw black gloves on the seat. After arresting Scott for driving on a suspended license, she performed an inventory search of his vehicle and discovered a pry bar. On appeal, Scott has not challenged his arrest or the introduction of the gloves and the pry bar.

After the arrest, McLaughlin also noticed that a global-positioning system (GPS) device was running in Scott's vehicle. McLaughlin pushed a button on the GPS and was able to observe the last address programmed into it, which happened to be the church where services for the Chelsea homeowner were being held. Scott objected to this evidence, arguing that McLaughlin's decision to access the GPS device without a search warrant violated his Fourth Amendment right to be free from unreasonable searches and seizures. As we discuss in greater detail below, McLaughlin eventually obtained a search warrant for the GPS and gained the same information, rendering the discovery inevitable. A search warrant for Scott's car revealed the presence of coins linked to yet another home invasion.

At Scott's trial, the prosecution presented evidence that Scott had been convicted of two other home invasions. Three witnesses testified about additional home invasions likely committed by Scott that closely resembled the five under the jury's consideration. One was committed in Wayne County on August 24, 2015, the same date as the last of the charged Livingston County burglaries, and the other in Oakland County on the same day as the first-charged Livingston County offense. The homeowners in the two uncharged cases were relatives of the Livingston County victims and attended the same funerals. Their testimonies described entry with a pry bar and the loss of jewelry and coins. In at least one of the cases, Scott pawned the stolen items at Michigan Cash for Gold. On appeal, Scott argues that this other-acts evidence was more prejudicial than probative, but raises no other challenge under MRE 404(b).

---

[1] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

-2-

The prosecution also introduced evidence obtained from Scott's cell phone, pursuant to a search warrant. That evidence connected Scott's cell phone location to two of the burgled homes on July 7, 2015, and to Michigan Cash for Gold on the same day. Cell phone evidence also linked Scott to the home invasions on July 27, and August 14, 2015. Scott has not challenged this evidence.

Finally, the prosecution introduced the testimony of Michigan State Police Lieutenant Brian Bergeron, whom the trial court qualified as an expert in "[f]irearms and tool mark identification." Bergeron opined that Scott's pry bar was used in two home invasions conducted on August 24, 2015, one in Livingston County and the other in Wayne County. Scott contends that had his counsel requested a *Daubert* hearing, this evidence would have been excluded. Even assuming that Scott is correct, it is not reasonably probable that a different result would have obtained had Bergeron's testimony been excluded. We turn first to that issue.

II

Lieutenant Bergeron testified that the pry bar found in Scott's car during his 2015 arrest had been used to make pry marks found in two burglaries that occurred on August 24, 2015. Scott contends that his trial counsel rendered ineffective assistance of counsel by failing to move for a *Daubert* hearing to test the admissibility of this evidence under MRE 702. Scott alternatively claims that the trial court committed plain error by admitting the evidence.

To obtain relief based on ineffective assistance of counsel, a defendant "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (cleaned up).[2] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (cleaned up).

MRE 702 states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[2] This opinion uses the parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

MRE 702 incorporates standards of reliability derived from *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004). In *Daubert*, 509 US at 597, the Court noted that an expert's testimony should "rest[] on a reliable foundation and [be] relevant to the task at hand." It added, "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Id*. The *Gilbert* Court stressed that before allowing expert testimony, a court must ensure that the testimony is reliable. *Gilbert*, 470 Mich at 781.

Scott contends that tool-mark analysis is not a reliable discipline, pointing to a 2009 National Academy of Sciences Report and a 2016 report from the President's Council of Advisors on Science and Technology. Both cast doubt on the reliability of toolmark identification evidence. In addition, Scott relies on (now Chief) Justice McCormack's concurring opinion in *People v McAdoo*, 497 Mich 975; 859 NW2d 711 (2015) (*McAdoo II*). In *People v McAdoo*, unpublished per curiam opinion of the Court of Appeals, issued August 28, 2014 (Docket Nos. 313880 and 313881), slip op at 5-6, this Court concluded that toolmark evidence presented by the prosecutor (through the same expert employed in this case) was properly admitted. The Supreme Court denied leave to appeal, but Justice McCormack, joined by Justice Bernstein, issued a concurring statement, noting her "unease with the expert testimony regarding the toolmark evidence offered by the prosecution." *McAdoo II*, 497 Mich at 975 (MCCORMACK, J., concurring). Justice McCormack stated, "I believe there are serious questions about whether such evidence has an adequate scientific foundation to allow its admission . . . ." *Id*. And in at least one case, a federal district judge found toolmark evidence of the sort offered by Bergeron inadmissible on *Daubert*-related grounds. See *United States v Smallwood*, unpublished opinion of the United States District Court for the Western District of Kentucky, issued October 12, 2010 (Case No. 5:08-CR-38), aff'd 456 Fed Appx 563 (CA 6, 2012).

Scott's counsel was aware of the President's Council of Advisors on Science and Technology report and evidently harbored doubts about the scientific reliability of the toolmark evidence. In her opening statement, counsel told the jury that "[i]t's not really called a science. Because it's not objective it's subjective. It doesn't have a scientific theory. And it doesn't have a plus or minus error rate." During Bergeron's direct testimony defense counsel launched a voir dire examination focused on discrediting the reliability of the toolmark evidence. The prosecuting attorney objected, arguing: "It seems like counsel is trying to attack the scientific validity of this which should have been done at a Daubert Hearing so I have to object to this entire line of questioning." The trial court agreed, stating, "[I]f your position is it's a junk science and they shouldn't hear about it at all that's a, that's a gate keeping issue that the Court decides." Although defense counsel managed to ask Bergeron several questions suggesting that his toolmark analysis lacked objectivity, the trial court prohibited further questioning.

We have located no legal support for the trial court's decision to curtail counsel's questioning of Bergeron regarding the reliability of toolmark "science." The questioning was relevant to Bergeron's credibility. Cross-examination directed at undermining an expert's opinions is proper even when the expert's testimony has passed muster under *Daubert*. "Questions about the certainty of the scientific results are matters of weight for the jury. . . . The assessment of the validity and reliability of the conclusions drawn by the expert is a jury question; the judge may only examine whether the principles and methodology are scientifically valid and generally accepted." *United States v Bonds*, 12 F3d 540, 563 (CA 6, 1993).

Nevertheless, we find relief unwarranted, as the court's error was harmless and counsel's possibly ineffective assistance did not create a reasonable probability that the outcome of the trial would have differed.

Aside from Bergeron's testimony, the prosecution presented powerful and substantial evidence of Scott's guilt. The pawn-shop evidence demonstrated that Scott had pawned many of the items stolen from the homes almost immediately after each robbery, and that his car was in the vicinity of four of the five burgled homes on the dates of the home invasions.[3] The other-acts evidence strongly implicated Scott in the funeral-day robberies, particularly given his admission that he had planned the robberies to coincide with funerals. Scott had a pry bar and gloves in his vehicle on the day he was arrested, and had been seen by a police officer using a pry bar and gloves to commit a home invasion. The pry-bar evidence connected Scott to only one of the four home invasions for which he was convicted.

This was not a close case. Even absent the toolmark evidence, we discern no reasonable probability that the result would have differed.

III

Scott next contends that the trial court erred by denying his request to represent himself. The trial court found that the request was untimely, would have created undue inconvenience, and was motivated solely by intent to delay the trial. These findings are reasonable and well supported.

On the first day of trial, but before jury selection, Scott complained that his counsel had not conducted meaningful discussions with him or filed proper motions, and announced that he wanted to represent himself. His attorney agreed that "he's lost confidence in me." She continued:

> He's asked me to do things that I don't agree with. And I'm not going to file every motion that he wants because I don't agree with every motion he wants. And I've tried to tell him that. And we've talked for many many months. And I think it's now the eve of trial and that now he's saying he doesn't[] want this trial he's not ready. We have had good communication previous. . . . I'm ready to proceed. The only issue is that my client doesn't have confidence. But I can tell you that I don't think he will get any other attorney that's gonna do any different. And I am ready to proceed. I've done a lot of work on this case. Even though he doesn't think so I have a strategy that disagrees with his strategy.

The trial court advised Scott that counsel's job included making judgment calls about how to proceed and that counsel seemed to have "worked very hard" and "filed a number of motions." The court added:

---

[3] The prosecution did not present cell phone location evidence for one of the Livingston County home invasions; Scott was acquitted of this count.

And just simply because you maybe have disagreed with her on strategy well you know that happens. I don't think that rises to the level of a breakdown in the attorney client relationship. You know the other thing is is that [sic] the potential for delay here. The Court has to take that into consideration. I don't find anything is present or so pressing that's been portrayed or communicated to the Court that would rise to the level that you know that I'm going to discharge her [at] this point in the process. We're here on the morning of trial. This is a 180-day case. You . . . asked me to give you a trial back in December. If this Court were to grant your request today, you know that's gonna cause further delay to you perhaps up to several months. And I don't find any reason provided to the Court to rise to the level of granting your request and delaying this matter further. . . . You know I . . . granted . . . one adjournment already to provide additional time for all the parties to be prepared including your own attorney to be prepared. You know during that timeframe, during that delay from December to now you could have availed yourself of the opportunity to obtain substitute counsel if you wanted to at that time. . . . I think with the seriousness of these charges I'm going to deny . . . your request to discharge [counsel] at this time.

Scott reiterated that he wanted to represent himself, and the court asked him if he was "prepared or equipped" to do so. He answered, "Not prepared but I will become prepared if I get an adjournment to this matter here. And represent myself. I have no evidence on this investigation." The court recessed to consider the matter further. When court reconvened, counsel stated that Scott had the right to self-representation. The court agreed, but said, "I think the question here is the timeliness of his request. That's really the issue." The court voiced concern that Scott was simply trying to obtain a different attorney. The prosecutor argued that Scott's request for self-representation was untimely: "This is the first we're hearing of this. I have 25 to 30 witnesses all lined up. Flying one in from out of state. I have some elderly people who one is 90 who is coming to testify." The prosecutor further noted that Scott was "totally unprepared" and that granting his request would "totally disrupt the trial process." She characterized his request as a "delay tactic."

The court observed that the potential jurors were waiting to be brought in, and that "this trial date has been set for months. I just don't understand why this issue wasn't raised until this morning. There have been weeks and weeks [in] which this issue could have been brought before the Court." The court asserted that it did not believe that Scott truly wanted to represent himself but instead did not want to be represented by his current counsel. The prosecutor again pointed out that Scott's goal was delay. The court ruled:

This is what I'm gonna do. . . . I'm gonna deny the request for self-representation for the reason that it's untimely. I do find that the circumstances by which it's made here on the morning of trial after the Court has denied the defendant's request to discharge his attorney [sic]. I further find that even if the Court were even to consider the defendant's request I do find that the defendant's request for self-representation will disrupt, inconvenience, and burden this Court in the administration of the Court's business in that this trial has been scheduled for months. It's the morning of trial. I have . . . 54 jurors waiting down the hall . . . .

So for both of those reasons that it's not timely and granting it would disrupt and inconvenience and burden the Court.

The court added:

I mean even if, even if this had been brought to the Court's attention on Friday I could have, I could have perhaps entertained it as somewhat timely when we were here for final status conference on Friday. But to raise[] [the self-representation and judicial-disqualification motions] here on the morning of jury selection is delay. It's delay tactics and the request[s] are denied.

When Scott renewed his self-representation motion the next day, the court again ruled the motion untimely and stated that it would "continue to be denied for the reasons I indicated on the record yesterday."

When a motion to forego counsel and proceed pro se has been made, we review for clear error a trial court's findings of fact and de novo the trial court's application of legal and constitutional standards. *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004). Deprivation of a defendant's Sixth Amendment right of self-representation constitutes a structural error demanding automatic reversal. *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999), citing *McKaskle v Wiggins,* 465 US 168; 104 S Ct 944; 79 L Ed 2d 122 (1984).

In *Faretta v California*, 422 US 806, 814; 95 S Ct 2525; 45 L Ed 2d 562 (1975), the United States Supreme Court held that the Sixth Amendment "implicitly embodies" the right of self-representation in criminal proceedings.

The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. . . . Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense. [*Id.* at 820-821.]

The Michigan Constitution explicitly protects a defendant's right to self-representation. Const 1963, art 1, § 13.[4] To protect a defendant's rights, our Supreme Court has promulgated rules that a trial court must follow when self-representation is sought.

Upon a defendant's initial request to proceed pro se, a court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting his right knowingly, intelligently, and voluntarily through a colloquy advising the

---

[4] The language in 1963 Const, art 1, § 13 states, "A suitor in any court of this state has the right to prosecute or defend his suit, either in his own proper person or by an attorney."

defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business. [*Russell*, 471 Mich at 190.]

As reflected in *Russell*'s fourth condition, "the right to self-representation is not absolute." *Martinez v Court of Appeal of California, Fourth Appellate Dist*, 528 US 152, 161; 120 S Ct 684; 145 L Ed 2d 597 (2000). "[M]ost courts require" a defendant to assert the right "in a timely manner." *Id*. at 162. This is so because "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id*.

We readily acknowledge that the commencement of trial proceedings did not necessarily preclude Scott's exercise of his right to self-representation. See *People v Anderson*, 398 Mich 361, 368; 247 NW2d 857 (1976). But that does not mean that a court must overlook the fact that his request came only after the parties had assembled for trial. Our Supreme Court recognized in a brief order that day-of-trial requests for self-representation may be rejected as untimely if a judge finds that self-representation would disrupt the administration of justice. *People v Hill*, 485 Mich 912; 773 NW2d 257 (2009).

In denying Scott's motion for self-representation, the trial court articulated several timeliness concerns. The court observed that the case had been adjourned at Scott's request, and that Scott had not raised any concerns about his attorney during the interval (almost six months) before trial. The court was apprised by the prosecution that a number of witnesses, some elderly and others from out of town, had made themselves available for the trial.

Thus, the trial court's finding that Scott sought to exercise his right to self-representation as a "delay tactic" finds support in the record. Moreover, Scott invoked his right to self-representation in conjunction with a request for an adjournment, and admitted that he was not prepared to proceed unless given additional time. Arguably, this qualification rendered Scott's request equivocal, affording another reason for denying it. We rest our holding on timeliness, however. The trial court did not clearly err in finding that Scott's belated request was untimely despite that it was made before the jury was impaneled, because it was motivated by a desire for delay. See *Robards v Rees*, 789 F2d 379, 384 (CA 6,1986).

We also reject Scott's argument that the trial court erred by failing to engage in the methodical assessment of his self-representation request set forth in MCR 6.005(D) and described in *Anderson*, 398 Mich at 368. Because the court denied self-representation on timeliness grounds, it did not need to insure that Scott understood the nature and consequences of self-representation. "[The purpose of the inquiry is to inform the defendant of the hazards of self-representation, not to determine whether a request is timely." *Hill v Curtin*, 792 F3d 670, 678 (CA 6, 2015).

IV

Scott next contends that McLaughlin's warrantless search of his GPS was unconstitutional, that it led to the discovery of further evidence, and that various pieces of

evidence should have been suppressed as fruit of the poisonous tree. Following a suppression hearing, the trial court found that an exigent circumstance justified McLaughlin's pressing of the GPS button. "We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress. We review de novo whether the Fourth Amendment was violated and whether an exclusionary rule applies." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009).

The trial court rested its ruling on McLaughlin's testimony that she feared that any data stored in the GPS device would be lost when the ignition in Scott's car was turned off for towing. She testified, "I was unsure with this system and how it totally operated if . . . any information would be lost when the car was powered off. Or the system was shut off." The prosecutor asked, "So at that point in time you were preserving potential evidence?" McLaughlin responded, "That is correct." McLaughlin took a photograph of the GPS screen after she pushed the button, capturing the address of the funeral home for the Chelsea homeowner.

After the car was safely lodged in a police garage, McLaughlin obtained a search warrant authorizing access to the GPS data. The police were unable to download the contents of the device, however, due to technical problems. They were able to retrieve only the same address that McLaughlin had photographed.

"The right against unreasonable searches and seizures is guaranteed by both the state and federal constitutions." *People v Jordan*, 187 Mich App 582, 586; 468 NW2d 294 (1991). See US Const, Am IV, and Const 1963, art 1, § 11. "Generally, a search conducted without a warrant is unreasonable unless there exists both probable cause and . . . circumstances establishing an exception to the warrant requirement." *Jordan*, 187 Mich App at 586. "The exigent-circumstance exception is applicable where the police have probable cause to believe that an immediate search will produce specific evidence of a crime and that an immediate search without a warrant is necessary in order to," among other things, "prevent the loss or destruction of evidence[.]" *Id*. at 587.

The trial court apparently determined that McLaughlin reasonably believed that data would be lost when Scott's car was turned off. Scott points out that McLaughlin offered no basis for her belief that the data would be lost or become inaccessible, and that the prosecution failed to produce any evidence supporting that McLaughlin's fear was rooted in a rational basis. Regardless of whether exigent circumstances existed for pushing the GPS button, discovery that Scott had programmed in the address of the funeral home proved to be inevitable. Assuming that Scott is correct and that McLaughlin improperly pushed the button, the address was nevertheless admissible.

In *Nix v Williams*, 467 US 431, 444; 104 S Ct 2501; 81 L Ed 2d 377 (1984), the United States Supreme Court adopted the inevitable discovery exception to the exclusionary rule, which it described as follows: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received." Michigan caselaw authorizes the admission of evidence obtained in violation of the Fourth Amendment "if it can be shown by a preponderance of the evidence that the items found would have ultimately been obtained in a constitutionally accepted manner."

*Hyde*, 285 Mich App at 439-440. The questions presented in inevitable discovery situations are: "(1) whether the legal means are truly independent, (2) whether both the use of the legal means and the discovery by that means are truly inevitable, (3) and whether the application of the inevitable discovery doctrine provides an incentive for police misconduct or significantly weakens Fourth Amendment protections." *Id*. at 440.

The police had ample untainted factual support for a search warrant application. Scott's car contained burglary tools and he was arrested near the home of a person attending a funeral. Police were aware that Scott had previously admitted to having planned home invasions based on information in obituaries. Inevitably, the police would have searched the GPS for evidence tying Scott to the other funeral-day home invasions under investigation. Because routine police practice and procedure would have led to the discovery of the address photographed by Trooper McLaughlin, this evidence was not subject to exclusion.

V

Scott next asserts that the trial court erred by admitting the other-acts evidence at trial because its probative value was substantially outweighed by the danger of unfair prejudice. We review this evidentiary claim for an abuse of discretion. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017).

Scott does *not* contend that the other-acts evidence was inadmissible under MRE 404(b). Instead, he rests his argument on MRE 403:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Michigan Supreme Court has explained that evidence is "probative" if it makes the existence of a consequential fact more probable than it would be without the evidence. *People v Feezel*, 486 Mich 184, 197; 783 NW2d 67 (2010); see also MRE 401. The Court noted that MRE 403 prohibits only evidence that is *unfairly* prejudicial. *Id*. at 198. Unfairness arises if there is a danger that marginally probative evidence will be given undue weight by the jury. *Id*.

The charged offenses all involved funerals, published obituaries, stolen coins and jewelry, and pried doors. Two of the four other-acts home invasions—the May 28, 2014 home invasion in Washtenaw County and the August 24, 2015 home invasion in Wayne County—also involved funerals, published obituaries, stolen coins and jewelry, and pried doors. The May 14, 2015 home invasion in Oakland County also involved a funeral, an obituary, and stolen jewelry, although the victim was not sure how her home had been accessed. The January 23, 2014 home invasion in Washtenaw County involved a funeral and stolen jewelry, although the police officer testifying about it did not provide details about an obituary or a pried door. Viewed together, however, the other-acts home invasions tended to prove that Scott hatched and executed a signature scheme when he committed the home invasions in Livingston County—a scheme involving the stealing of jewelry while victims attended the funeral of a loved one.

The evidence that Scott had been *convicted* in connection with the January 23 and May 28, 2014 home invasions definitively tied Scott to the scheme, and therefore tended to prove his identity as the perpetrator of the Livingston County home invasions. His conviction for possession of burglary tools also tied him, in particular, to the scheme. The circumstances surrounding the arrest for this latter offense were particularly probative because (1) Scott had a funeral-home address programmed into his GPS—further evidence of the "funeral" scheme; (2) a pry bar was found during the arrest, and (3) coins in Scott's car were consistent with coins taken during a Livingston County offense.

The prosecutor did not have eyewitnesses to the charged offenses, or confessions or incriminating statements. This was a case built on circumstantial evidence, buttressed by the evidence admitted under MRE 404(b). That evidence was highly probative of Scott's guilt.

Scott argues that because the jurors learned that defendant previously committed the same crimes as those charged, they were likely to have convicted him based on propensity. He cites the warning from *Denson*, 500 Mich at 397-398 (cleaned up), that "bad acts evidence can weigh too much with the jury" and lead to a conviction based on propensity. But the purpose of the MRE 403 balancing test is to weigh the risk of prejudice against probative value, and the probative value of the other-acts evidence in this case was high. In addition, the court told the jurors that they could not use the other-acts evidence to decide that defendant was a bad person or "likely to commit crimes" and could not "convict the defendant here because you think he is guilty of other bad conduct." This served to lessen any prejudicial impact. *People v Katt*, 248 Mich App 282, 308; 639 NW2d 815 (2001), aff'd 468 Mich 272 (2003).

Perhaps the most compelling indication that the other-acts evidence was not overly prejudicial is the fact that the jurors acquitted Scott of the May 14, 2015 Livingston County home invasion. If the jurors were apt to decide that Scott must have committed the charged offenses because he had committed similar offenses, they would have convicted him of this offense. Instead, they apparently weighed the evidence available and decided that the prosecutor did not present sufficient proof of Scott's involvement in that crime.

In addition, "[w]hether other-acts evidence is more prejudicial than probative is best left to the contemporaneous assessment of the trial court." *People v McGhee*, 268 Mich App 600, 614; 709 NW2d 595 (2005). Even in close cases, "A trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. Under all the circumstances, the trial court's decision was within the range of reasonable and principled outcomes. See *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).

VI

The court sentenced Scott to four concurrent terms of 19 to 30 years' imprisonment. The sentencing guidelines produced a range of 58 to 171 months for each of the four offenses, so the sentences represented a departure of 57 months (4 years and 9 months). Scott does not take issue with the scoring of the guidelines but instead argues that the trial court should not have departed from the guidelines and gave inadequate reasons for doing so.

A sentence departing from the guidelines range is reviewed by this Court for reasonableness. *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (cleaned up). In determining proportionality, a court is allowed to consider whether certain factors were not adequately encompassed by the guidelines or not encompassed by the guidelines at all. *Milbourn*, 435 Mich at 656-657.

During sentencing, the court noted that both Washtenaw County and Oakland County had given Scott "breaks" by sentencing him to probation, but defendant "went right back out and continued to commit home invasions." The court stated that Scott "rob[bed] people of the sense of safety and security that they have in their homes." It mentioned that Scott had also stolen some weapons, characterizing this as an "incredible risk to public safety because who knows where those weapons end up." The court expressed its disbelief that the scores for prior-record variable (PRV) 6, PRV 7, or offense-variable (OV) 16 adequately accounted for the circumstances of the case. Scott takes particular issue with the court's comments concerning these variables.

Scott claims that the trial court erred by concluding that PRV 6 did not fully account for his probationary status, as he was given 10 points for this variable. PRV 6 concerns an offender's "relationship to [the] criminal justice system[.]" MCL 777.56(1). Ten points are assessed if "[t]he offender is on parole, probation, or delayed sentence status or on bond awaiting adjudication or sentencing for a felony[.]" MCL 777.56(1)(c). The court noted that Scott was on probation for the same type of crimes when he committed the charged offenses, despite being given "breaks" by the courts. The court also considered that Scott was on bond from Washtenaw County when he committed the Oakland County offense, before going on to commit the Livingston County break-ins. Given the number of prior offenses committed by Scott for which he could have been imprisoned, we agree that PRV 6 did not adequately weigh Scott's prior history.

Scott further contends that the trial court erred by concluding that his 20-point score for PRV 7 ("subsequent or concurrent felony convictions") did not fully account for the circumstances at issue. Scott was given the maximum amount of points for PRV 7. MCL 777.57(1)(a) provides for a score of 20 points if "[t]he offender has 2 or more subsequent or concurrent convictions[.]" MCL 777.57(2)(a) states, "Score the appropriate point value if the offender was convicted of multiple felony counts or was convicted of a felony after the sentencing offense was committed."

Scott's argument that he was given the maximum points available for PRV 7 was precisely the trial court's point—the court noted that the variable "stops counting at two" but that Scott had more than two concurrent felonies. Admittedly, the trial court appears to have erred by discussing Scott's pending charges while discussing the scoring of PRV 7, because that variable explicitly refers only to convictions, not charges. In any event, Scott had three concurrent

convictions, representing four total home-invasion convictions. As such, PRV 7 did not fully take into account the circumstances before the court.

Scott contends that the trial court erred by concluding that his 10-point score for OV 16 ("property obtained, damaged, lost, or destroyed") was inadequate because he was given 10 points under this variable based on the sentimental value of stolen items. MCL 777.46(1)(d) provides for a score of 10 points if "[t]he property had a value of more than $20,000.00 or had significant historical, social, or sentimental value[.]" Defendant is correct that OV 16 already accounted for the sentimental value of the subject items. However, the court's thrust was that OV 16 takes into account the value of material property but not the "robb[ing] . . . of [an] ability to grieve." The court emphasized that during their time of grief, the victims were forced to deal with the consequences of the home invasions. This factor, in particular, distinguished this case from "run-of-the-mill" home invasions. We find no error in this analysis.

The trial court articulated multiple reasons for its departure from the guidelines, and the reasons were cogent, clear, and tenable. Scott contends that the court did not adequately justify the extent of its departure. In making its various statements on the record, howver, that is exactly what the trial court did; it explained why a departure from the guidelines of 4 years and 9 months was warranted. The trial court "adequately explain[ed] why" the sentences it imposed were "more proportionate than . . . different sentence[s] within the guidelines would have been." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017), oral argument gtd on app 501 Mich 1066 (2018).

Given all the circumstances, the court did not abuse its discretion in sentencing Scott as it did; the sentences were reasonable and did not violate the principle of proportionality.

VII

Scott finally contends that the trial court erred by denying him sentence credit under MCL 769.11b. "Whether a defendant is entitled to credit for time served in jail before sentencing is a question of law that we review de novo." *People v Armisted*, 295 Mich App 32, 49; 811 NW2d 47 (2011).

Scott was arraigned on June 30, 2016, and did not post bond. MCL 769.11b states:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

Scott's presentence investigation report reveals that at the time of his arraignment through his May 2017 Livingston County sentencing, Scott was incarcerated for at least one other offense. In *People v Givans*, 227 Mich App 113, 115, 125; 575 NW2d 84 (1997), the defendant committed an armed robbery in Washtenaw County and was later arrested and detained continually after committing two assaults in Jackson County. This Court concluded that the defendant was not entitled to sentence credit in Jackson County under MCL 769.11b for the time spent incarcerated before his sentencing for assault but after his sentencing for armed robbery,

-13-

because the time had been served "not for the charges in the present case, but for the Washtenaw County conviction[.]" *Id*. at 125-126. The Court emphasized that MCL 769.11b refers to a person's having served time for "the offense of which he is convicted." *Id*. (emphasis removed).

*Givans* is directly on point. Scott was serving time for a different offense between his arraignment and sentencing for the current offenses, and therefore is not entitled to sentence credit under MCL 769.11b. Scott contends that only when one is incarcerated for an "unrelated" case is sentence credit unavailable, relying on *People v Prieskorn*, 424 Mich 327; 381 NW2d 646 (1985). In that case, the Court stated:

> We believe [MCL 769.11b] neither requires nor permits sentence credit in cases, such as the one before us, where a defendant is released on bond following entry of charges arising from one offense and, pending disposition of those charges, is subsequently incarcerated as a result of charges arising out of an unrelated offense or circumstance and then seeks credit in the former case for that latter period of confinement. [*Id*. at 340.]

Scott argues that the time he was serving was for "related"—not "unrelated"—offenses and therefore he should be entitled to sentence credit. But this is not a tenable reading of *Prieskorn*. Indeed, the *Prieskorn* Court stated, "The Legislature sought, in enacting [MCL 769.11b], to give a criminal defendant a right to credit for any presentence time served for the offense of which he is convicted, *and not upon any other conviction*." *Id*. at 341 (cleaned up, emphasis added). The Court noted that the primary purpose of the statute was to equalize the status of defendants who can and cannot obtain release on bond:

> In the case before us, the defendant posted bond for the first two marijuana charges and was at liberty when he was arrested for the driving offense. He was again released on bond on that offense and was not again incarcerated until July 20, 1982, when he began to serve the ninety-day sentence for the traffic violation. He now seeks credit, in this case, for fifty-one days of the confinement he served under sentence for the driving offense. The statute grants no entitlement to such credit however, because the defendant did not serve that time because of his inability to post bond for the March 9, 1982, marijuana delivery offense of which he now stands convicted. [*Id*. at 343.]

Throughout the entire pendency of the Livingston County proceedings, Scott was serving time *in prison* because of a separate conviction, not because of "his inability to post bond for the [Livingston County] . . . offense[s] of which he now stands convicted." *Id*. Contrary to Scott's assertion, *Prieskorn* supports the *denial* of sentence credit, not the *granting* of it.

The *Prieskorn* Court added:

> To be entitled to sentence credit for presentence time served, a defendant must have been incarcerated "for the offense of which he is convicted." Since the fifty-one days of incarceration for which the defendant seeks credit is unrelated to the offense before us for which he has been convicted, he is not entitled to sentence credit for that confinement. [*Id*. at 344.]

Merely because the *Prieskorn* Court employed the term "unrelated" does not mean that time served for crimes bearing some type of "relationship" to a sentencing offense must be granted as sentence credit. The salient holding of *Prieskorn* is that "[t]o be entitled to sentence credit for presentence time served, a defendant must have been incarcerated 'for the offense of which he is convicted.' " *Id*. Scott was not, seeing as he was in *prison*, not jail. And he would have remained incarcerated whether he had bond money or not. See, e.g., *People v Idziak*, 484 Mich 549, 562-563; 773 NW2d 616 (2009); see also *People v Whiteside*, 437 Mich 188, 196; 468 NW2d 504 (1991) ("Given that the primary purpose of § 11b is to equalize the position of one who cannot post bond with that of a person who is financially able to do so, a showing that presentence confinement was the result of inability to post bond is an essential prerequisite to the award of sentence credit under the statute."). Scott's argument is without merit.

We affirm.


/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher