*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

TERRENCE CHARLES HICKS,

        Defendant-Appellee.

UNPUBLISHED
May 4, 2023

No. 361204
Wayne Circuit Court
LC No. 21-005542-01-FH

Before: RICK, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

The prosecution appeals as of right the circuit court's order of dismissal without prejudice of the charge of carrying a concealed weapon, MCL 750.227, following its decision to grant defendant's motion to suppress evidence on the basis of a Fourth Amendment violation. On appeal, the prosecution argues that the circuit court erred because the police did not violate the Fourth Amendment when observing and seizing the concealed handgun at issue. We agree. Therefore, we reverse the circuit court and remand to that court for further proceedings.

## I. FACTS

On October 13, 2020, several Detroit police officers were driving through a residential area when they observed a group of people drinking alcohol in the street near a parked minivan. The group was blocking the police vehicles' path, but they started to disperse once the police vehicles were in sight. Some of the group walked past the minivan, which appeared to be occupied by multiple individuals. Because drinking alcohol in the street is a violation of state law and city ordinance,[1] the police quickly exited their vehicles to investigate. From an officer's video recording of the incident, officers exited their vehicle, parked to the rear and street side of the minivan, and approached the group by traversing on foot by the driver's side and passenger's side of the parked minivan.

---

[1] See MCL 436.1915(1) and Detroit Ordinance, § 31-5-2.

Detroit Police Officer Amen-Ra, one of the officers involved in this incident, was the only officer to testify at the preliminary examination. He testified that he immediately exited his "raid van" once his "crew" observed the apparent alcohol consumption and approached the minivan to investigate. He explained that he observed an individual, later identified as defendant, "sitting on the rear floorboard and the backdoor was open of the minivan."[2] At that time, Officer Amen-Ra observed a "pistol clip" which appeared to be "inside the waistband" of defendant. Officer Amen-Ra stated that the "pistol clip" he observed was not a magazine, but instead it was a clip for a pistol holster. Officer Rodriguez, who also was investigating the passenger side of the minivan with Officer Amen-Ra, lifted defendant's shirt and recovered a loaded handgun from the defendant. The defendant admitted to Officer Amen-Ra that he did not have a concealed pistol license. After hearing this testimony, the district court bound defendant over to the circuit court on the charge of carrying a concealed weapon.

Defendant moved to suppress the seized concealed handgun in the circuit court, arguing that the police officers "did not have a reasonable, articulable suspicion that [he] was engaged in criminal activity" when he was sitting in the minivan, and consequently, the concealed handgun was the fruit of an unlawful seizure. In other words, defendant argued that the testimony at the preliminary examination and the police body-camera videos of the incident did not show that he was openly consuming alcohol at the time, so the police officers had no legal justification for quickly approaching the minivan and seizing him, which led to the discovery of the concealed handgun.

The circuit court, after reviewing the preliminary-examination testimony and police body-camera videos, granted defendant's motion to suppress the concealed handgun, reasoning from the bench as follows:

> I understand that once they got to the van there was something that was seen, but the Court doesn't have an issue with that. And I saw the video and they claimed that when they got to the van, they saw the clip. The problem I have is how do you get to the van. . . . The crew investigated the group in the street and [Officer Amen-Ra] just went to the van and that's where they observed this clip. So, the question was asked on Page 42. Did you see Hicks with any alcohol, no, I didn't. . . . I did not see him consuming any alcohol or an open container in his hand . . . .
>
> * * *
>
> And nobody testified that Mr. Hicks was a part of that group and went to the van thus, would necessitate a reason to go to the van, reasonable suspicion. If he's in the group, he's got open intoxicants the cops will come out and investigate because they shouldn't have open intoxicants which is, I believe a ticketible [sic] offense and they got the van because they were—they were investigating individuals in the street who were drinking. But the testimony on the record was that they didn't even

---

[2] Defendant was on the passenger's side of the minivan.

see Mr. Hicks as a part of that crowd and he specifically said he could have been seated there already. So, what would be the reason that they went to the van at all.

They didn't follow somebody with alcohol in their [hand] to the van. We don't even know that Mr. Hicks was a part of that group. So, that is what I'm saying, [prosecutor], I understand that once they get to the van, yes, they see something. That's not my problem my problem is why did they go to the van in the first place there's no testimony on this record that he was a part of that group. And a matter of fact, the testimony is they don't know if he was a part of the group and, matter of fact, they could have been sitting there all together. So, there was no reason to go to the van. They had no reason there needs to be reasonable suspicion based on something as to why you're investigating you can't just jump out of your raid van and run to a van and then check somebody out who does not even apply to the crew. So, the Court is going to suppress.

The circuit court accordingly dismissed the case, and the prosecution now appeals.

## II. DISCUSSION

"We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). We also review de novo whether the Fourth Amendment was violated. *Id*. Clear error occurs when this Court is left "with a definite and firm conviction that the trial court made a mistake." *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." US Const, Am IX. See also Const 1963, art 1, § 11. When an individual's Fourth Amendment rights have been violated as a result of an unreasonable search or seizure, an appropriate remedy is to suppress the evidence obtained as a result of that violation. See *Terry v Ohio*, 392 US 1, 12; 88 S Ct 1868; 20 L Ed 2d 889 (1968). "A search for Fourth Amendment purposes occurs only when an expectation of privacy that society is prepared to consider reasonable is infringed." *People v Custer*, 465 Mich 319, 333; 630 NW2d 870 (2001) (quotation marks and citation omitted). "If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause." *Id*. (quotation marks and citation omitted).[3]

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967). "[T]he mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point

---

[3] "A 'seizure' occurs within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding an encounter with the police, a reasonable person would have believed that the person was not free to leave." *People v Shankle*, 227 Mich App 690, 693; 577 NW2d 471 (1998).

where he has a right to be and which renders the activities clearly visible." *California v Ciraolo*, 476 US 207, 213; 106 S Ct 1809; 90 L Ed 2d 210 (1986). In other words, police officers are not required "to shield their eyes . . . on public thoroughfares." *Id.* Further, police officers are even permitted "to approach the home by the front path, knock promptly, [and] wait briefly to be received" without committing a search for the purposes of the Fourth Amendment. See *Florida v Jardines*, 569 US 1, 9; 133 S Ct 1409; 185 L Ed 2d 495 (2013).

In the matter before us, the police officers, including Officers Amen-Ra and Rodriguez, had a right to be on the public streets in Detroit—including the residential street on which defendant was arrested. The police officers were investigating a group of people openly consuming alcohol on a residential street in violation of MCL 436.1915(1) and Detroit Ordinance, § 31-5-2. Officers Rodriguez and Amen-Ra, and other officers, were free to pass by both sides of the minivan on the street as they moved to investigate a potential violation of the law. Moreover, because defendant was sitting near the edge of the minivan with his body exposed to public view on the residential street, the police officers—as with any private citizen passing by—had a right to view defendant as he sat exposed through the open door of the minivan.[4] In the course of doing so, Officer Amen-Ra and apparently Officer Rodriguez as well observed that defendant appeared to be in possession of a pistol holster inside his waistband, which suggested to them that the defendant may also be in possession of a firearm.

The circuit court also seemingly found as fact that the police officers viewed the pistol holster while outside the minivan, stating that "I understand that once they got to the van there was something that was seen, but the Court doesn't have an issue with that."[5] This viewing by the police officer justified a search of defendant for officer and public safety, a well-recognized exception to the warrant requirement. See *Terry*, 392 US at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."); *id.* at 29 ("The sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."). This is particularly true in light of the fact that there was surrounding suspected criminal activity in the street. See *United States v Lewis*, 674 F3d 1298, 1308 (CA 11, 2012) ("An officer may control persons . . . if they are near a street encounter with persons reasonably suspected of criminal activity.") (cleaned up). Further, upon seeing the gun clip, the officers also were warranted in suspecting that "criminal activity may be afoot," and the defendant confirmed this when he stated

---

[4] Although the conduct of the police officers in quickly approaching the minivan is obviously explained by the fact that they observed a nearby group of people consuming alcohol in public, the officers did not need to witness any violation of the law to permissibly be in a position to view what defendant was exposing to the public.

[5] Later, the circuit court added that "I understand that once they get to the van, yes, they see something. That's not my problem . . . ." However, we acknowledge that the circuit court also stated after deciding the motion that "I don't even think it's on the record that it was in plain view," apparently referring to the pistol holster which could not be seen through the limited view and angle of the recorded video.

he did not have a permit to possess a concealed weapon. See *Terry*, 392 US at 30. For these two reasons, the seizure and search of defendant, which led to discovery of the concealed handgun, was justified and was not illegal.

In ruling otherwise, the circuit court reasoned that the police officers did not have "reasonable suspicion" to "run to [the minivan] and then check somebody out who does not even apply to the crew." We agree with the circuit court that neither the testimony at the preliminary examination nor the video of the incident showed that defendant was one of the individuals drinking alcohol in the street, and as a result, the police officers did not have reasonable suspicion to justify searching or seizing him based upon that violation. But, that is not the scenario before us. The police did not view the pistol holster as a result of investigating those originally seen consuming alcohol on the street. Rather, after exiting their vehicle and while on their way to investigate, the police officers, on a residential street, where they had a right to be, as did any person, they observed what defendant was exposing to the world—a pistol holster inside his waistband. This observation did not implicate the Fourth Amendment because it was not a "search," nor was the defendant restrained at the time of the observation. Based upon this plain-view observation, the resulting search of defendant by lifting his shirt, which led to discovery of the concealed handgun itself, was justified under *Terry*. Accordingly, there was no Fourth Amendment violation, and the concealed handgun should not have been suppressed and the case should not have been dismissed.[6]

## III. CONCLUSION

The police did not commit a "search" of defendant for the purposes of the Fourth Amendment when they viewed the pistol holster from a public vantage point. As a result, discovery of the pistol holster, which immediately led to discovery of the concealed handgun itself, did not violate the Fourth Amendment.

---

[6] On appeal, defendant suggests that the concealed handgun was obtained as the fruit of an unlawful seizure. The essence of his argument in this regard is that he was "seized" for the purposes of the Fourth Amendment when the police officers quickly surrounded the minivan under circumstances that did not allow him to voluntarily leave the vicinity, see generally, *Florida v Bostick*, 501 US 429; 111 S Ct 2382; 115 L Ed 2d 389 (1991), and the concealed handgun would not have been obtained by the police without this unlawful seizure. We disagree with this framing of the issue.

Assuming for the sake of argument that defendant was "seized" by the police presence, the pistol holster was simultaneously observed while the police were lawfully in a public place and viewing what defendant exposed to the public. In other words, if only one police officer approached the minivan under circumstances that did not indicate a "seizure" under *Bostick*, the pistol holster still would have been observed by the police. This supports our conclusion that the pistol holster was viewed not as a result of any seizure, but instead by a visual observation from a public vantage point.

We therefore reverse the circuit court and remand to that court for further proceedings consistent with our opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Michael J. Riordan